Carl et al., Appellants, *v.* Matzko, Appellant.

Submitted September 10, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Robert E. Bull, Paul Matzko,* and *Obermayer, Rebmann, Maxwell & Hippel,* and *Clark, Ladner, Fortenbaugh & Young,* for appellant.

*Gailey C. Keller,* with him *Smith, Eves and Keller,* for appellees.

*Arthur M. Peters, Jr.,* for appellee.

OPINION BY HOFFMAN, J., December 12, 1968:

The parents of Bruce Carl, Jr. brought this action on their son's behalf and in their own right against defendants, Dr. M. J. Matzko and Dr. F. B. Clemens, for their alleged malpractice in the care and treatment of their son. The jury rendered a verdict of $1000 for the parents and $1000 for the minor, against both defendants. After post-trial motions were argued, the court entered judgment against Dr. Matzko but granted judgment n.o.v. for Dr. Clemens. Dr. Matzko has now appealed the verdict against him, and the plaintiffs have appealed the granting of judgment n.o.v. to Dr. Clemens.

The relevant facts, as found by the lower court, are as follows: At 10:00 a.m. on Friday, August 21, 1964, Bruce Carl, Jr., then seventeen years of age, was piling rocks in a stream near his home in Beach Haven, Luzerne County. As he bent over to lift a heavy rock, he felt a "stinging sensation" in the right testicle. The pain persisted and after a short interval, Bruce found his testicle to be quite red. When he pressed it, he became sick and threw up. At about 1:30 p.m., his parents took him to the office of Dr. M. J. Matzko.

Dr. Matzko examined Bruce, prescribed medication, and advised rest. The boy returned home and rested. The pills seemed to give some temporary relief; however, pain continued throughout the night and next morning.

At 3:30 p.m. on Saturday, Bruce accompanied his family to a picnic. They returned home, however, shortly after 6:00 p.m. because of the boy's intense pain.

The mother was unable to reach Dr. Matzko. At 9:00 p.m. Bruce was taken to the Berwick Hospital and briefly examined by Dr. F. B. Clemens who was designated as the weekend doctor for the community. Dr. Clemens completed an "Emergency and Accident Register". After the printed word "Treatment" he wrote "torsion of the spermatic cord—temperature 101.3°." He then prescribed antibiotics and analgesics, and admitted Bruce into the hospital. He never treated Bruce again.

The boy was next seen on Monday morning, August 24th, by Dr. Matzko. He continued the treatment of Dr. Clemens, changing only the type of antibiotics prescribed. Furthermore, the scrotum was elevated with cold compresses being applied. The hospital history and physical examination report made by Dr. Matzko at that time concludes, as follows: "Diag. (1) Acute epididymitis (2) Orchitis, acute right severe (3) Torsion of right testicle."

Even though Bruce experienced some intervals of comfort and sleep between Monday and Wednesday, the pain became more severe and the discoloration of the scrotum more pronounced. On Thursday, August 27th, Bruce's condition worsened dramatically. At his mother's insistence, Dr. James B. Gormley, surgeon for the Berwick Hospital, was consulted. After an examination, Dr. Gormley diagnosed "possible torsion" and advised and performed immediate surgery.

The Operation Record signed by Dr. Gormley reads, in part, as follows: "The right testicle was found to be involved in a partial torsion with apparent compromise of the return circulation from the testicle. The epididy-

mous was particularly edematous and hemorrhagic. The reduction of the torsion did not effect then any significant improvement in the appearance of the epididymous. The testicle was therefore removed. . . ."

At trial, plaintiffs contended that Drs. Matzko and Clemens were negligent because they either failed to diagnose and treat Bruce for torsion or, in the alternative, they diagnosed torsion but failed to treat him properly in accordance with that diagnosis. In submitting the case to the jury, the court coupled plaintiffs' two alternative grounds for recovery.

The court charged the jury in part as follows: "If you find by the fair preponderance of the evidence that Bruce Carl, Jr. was suffering from a torsion or twist of the spermatic cord or that his condition was such that it even strongly suggested the existence of a torsion or twist, and that Dr. Clemens or Dr. Matzko or both did or should have diagnosed this condition, then you must find that one or both of the doctors were negligent in treating Bruce Carl, Jr. with bedrest, ice packs and antibiotics, and in not ordering surgery immediately so that the torsion or twist could be removed and the testicle saved."

We hold that it was improper for the trial court to charge the jury that they might find for plaintiffs if defendants did not but should have diagnosed torsion.

To allow such a conclusion, expert medical testimony must be introduced which would establish that defendants, in failing to diagnose torsion, had departed from the standard of care exercised by other physicians in the community. *Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558 (1935); *Lambert v. Soltis*, 422 Pa. 304, 221 A. 2d 173 (1966).

Plaintiffs, however, did not offer any such testimony. Three doctors testified. Clemens and Matzko

did not testify as to the propriety of a torsion diagnosis. Dr. Gormley, the surgeon, who testified on behalf of plaintiffs, failed to consider the appropriate standard of care. He failed to state that defendants' failure to diagnose and treat for torsion departed from the standard of care generally exercised by physicians in their community. His testimony concerning his probable individual diagnosis is vague and unresponsive to that issue.

"The only exception to the requirement that expert testimony must be produced [in malpractice cases which involve an appraisal of the care and skill of a physician] is 'where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons . . .' " *Smith v. Yohe*, 412 Pa. 94, 194 A. 2d 167 (1963) ; see also *Lambert v. Soltis*, supra at 308-309.

This exception is inapposite here, however, because it is difficult to discriminate between epididymitis, for which he was treated initially, and torsion of the spermatic cord. Dr. Gormley specifically testified that the two are frequently confused by physicians and involve a multitude of factors and considerations. The observation of these factors, and their significance at any given time in relation to the patient's problem and progress, could only be judged by a physician and are not matters within the common knowledge of lay persons.[1]

---

[1] Medical testimony indicated that the diagnosis and treatment of Bruce Carl, Jr. involved such factors as swelling, tenderness, discoloration compared to normal, temperature, evidence of shock, elevation of testicle, rotation of testicle, discrimination between the epididymitis and the testes, transillumination, size and consistency of testicle as compared to normal, inflammation of skin, hotness, manual palpation of testicles and reaction on examina-

In summary, the court should not have charged the jury that defendants would be liable if they "should have" diagnosed torsion. This is so because there was no expert testimony to establish the appropriate standard of care, and the decision could not be based on the knowledge of the jury alone.

The court also improperly submitted to the jury the question of whether Dr. Clemens actually "knew" or strongly suspected that Bruce suffered a torsion. While all the medical witnesses agreed that immediate exploratory surgery is the *only* proper response to a diagnosis or strong suspicion of torsion, there is no evidence that Dr. Clemens finally concluded or strongly suspected that Bruce suffered a torsion.

Dr. Clemens, called as if on cross-examination by plaintiff, testified that during the course of his examination he recorded in the Emergency and Accident Register that Bruce suffered a "torsion of the spermatic cord." During the cross-examination conducted by his attorney, Dr. Clemens stated that "the note I made in the book was one of my initial impressions."

After the plaintiff rested, Dr. Clemens testified in his own behalf. He stated that during the hour that Bruce was under his care he abandoned his immediate snap impression that Bruce suffered a torsion and concluded instead that the boy suffered from epididymitis, an infection of the scrotum. This conclusion was necessitated by a physiological analysis which would not permit any other diagnosis. Had Bruce suffered a torsion from the lifting of a rock thirty-six hours prior

---

tion, cyanosis, temperature change, effect of medication, progress, vomiting, history, passage of time, emotional state, amount of discomfort, pain, changes therein, location of organs, testis, spermatic cord, epididymitis, inguinal canal, relation of structures to normal, increased or decreased blood flow, increased or decreased blood cells, existence of a nonobservable congenital defect, knowledge of anatomy and physiology and practical medical experience.

to his examination, his symptoms would have been totally different from those Dr. Clemens observed. A torsion results in a cutting off of the blood supply which in turn produces a gangrenous effect. After thirty-six hours, this would produce a small, soft and mushy testicle. Bruce, however, at the time of Dr. Clemens' examination had a swollen, hot, red, inflamed testicle.

This condition, according to Dr. Clemens' testimony, could only be reconciled with a diagnosis of epididymitis. Epididymitis is caused by bacteria which are counteracted by an increased blood supply to the scrotum as the body supplies white blood cells to the infected area. The bacteria are fed by the increased supply of blood which in turn stimulates a greater production of white blood cells. "More disease means more increased blood cells, and in thirty-six hours, we have a hot, red mass, red because you have increased blood flow."

This physiological explanation was never contradicted. Therefore, the only evidence offered to show that Dr. Clemens in fact knew or strongly suspected that Bruce suffered from torsion was the entry "torsion of the spermatic cord" in the Emergency and Accident Register.

Little, if any, weight, however, can be given to this evidence. Dr. Clemens testified that the Register, as distinct from a patient's chart, was not used for treatment purposes. Rather, it was used primarily by the hospital for "the purpose of billing the patient later on." Thus, Dr. Clemens did not think it necessary to amend the Register after he abandoned the first impression of torsion. Indeed, the record was not referred to by medical personnel for treatment purposes. Dr. Matzko testified that he did not refer to the Emergency and Accident Register. Significantly, Dr. Clemens made no entry on Bruce's treatment chart.

Moreover, plaintiff is precluded from asserting that the notation on the Emergency and Accident Register represented a final diagnosis, because Dr. Clemens stated when called as if on cross-examination, that it represented one of "my initial impressions." In *Amato v. Landy*, 416 Pa. 115, 204 A. 2d 914 (1964), the Supreme Court stated: "A party calling an adverse witness—and the defendant was an adverse witness as far as the plaintiffs are concerned in this case—is bound by his uncontradicted testimony." Similarly in *Piwoz v. Iannocone*, 406 Pa. 588, 178 A. 2d 707 (1962), the Supreme Court also stated that "it is well established that where a litigant calls his adversary as for cross-examination pursuant to the Act of May 23, 1887, P. L. 158, §7, 28 P.S. §381, that the testimony thus obtained is conclusively taken to be true if it is not rebutted by other evidence . . . subject to the exceptions that there may be such a degree of improbability in the statements themselves as to deprive them of credit, or that circumstances themselves may constitute sufficient contradiction."

Therefore, since Dr. Clemens' statement that the notation only represented a "first impression" was never contradicted at trial, it binds plaintiffs.

Accordingly, the most that plaintiffs have shown is that Dr. Clemens entertained an early snap impression that Bruce suffered a torsion. This falls far short, however, of demonstrating that he knew or strongly suspected at the completion of his examination, that Bruce did in fact suffer from torsion. Dr. Clemens, therefore, is entitled to judgment n.o.v. Act of April 22, 1905, P. L. 286, §1, 12 P.S. 681. *Karam v. Pennsylvania Power and Light Co.*, 205 Pa. Superior Ct. 318, 208 A. 2d 876 (1965). A contrary result would place Dr. Clemens, who had only the briefest contact with Bruce, in the position of being an insurer upon whom

liability may be imposed without a demonstration of fault. This was clearly proscribed when the Supreme Court stated: "The standard of care required of a physician or surgeon is well settled. In the absence of a special contract, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment." *Donaldson v. Maffucci*, 397 Pa. 548, 156 A. 2d 835 (1959). Likewise in *Tyson v. Baizley*, 35 Pa. Superior Ct. 320 (1908), we stated that "a physician or surgeon is not an insurer of his patient's health, nor of a recovery from an abnormal condition."

Thus, as there was no testimony that Dr. Clemens actually knew or strongly suspected at the completion of his examination that Bruce suffered a torsion, "no presumption or inference of negligence arises merely because the medical care . . . terminated in an unfortunate result which might have occurred even though proper care and skill had been exercised . . ." *Robinson v. Wirts*, 387 Pa. 291, 127 A. 2d 706 (1956). Judgment n.o.v., therefore, was properly entered for Dr. Clemens.

There is, similarly, no evidence to indicate that Dr. Matzko knew or strongly suspected that Bruce suffered a torsion.

The only evidence which plaintiff introduced relating to this question was the hospital treatment chart of Bruce wherein Dr. Matzko noted on the Monday following Bruce's admission to the hospital: "Diag. (1) Acute epididymitis (2) Orchitus (3) Torsion of the right testicle."

Dr. Matzko did not testify as to the significance of this entry.

On its face the entry seems to be a differential diagnosis whereby Dr. Matzko listed all of the possible causes of Bruce's distress. Medical testimony indicated that in most cases epididymitis, orchitus and tor-

sion of the testicle are not present at the same time. It is readily conceivable that all Dr. Matzko did was to list alternative and exclusive possibilities of conditions which may have caused Bruce's distress.

The entry does not indicate that Dr. Matzko knew or strongly suspected torsion. It only indicates a mere suspicion of torsion. The burden was upon plaintiffs, however, to demonstrate that the entry was indicative of a strong suspicion. Since they failed to present such evidence, the court should not have submitted the question of Dr. Matzko's knowledge or strong suspicion to the jury.

In accordance with the above, a judgment n.o.v. is entered on behalf of Dr. Matzko. Judgment n.o.v. entered on behalf of Dr. Clemens is affirmed.