385 A.2d 1376

**Stephen BRANNAN, Appellant,**

v.

**LANKENAU HOSPITAL, Hunter S. Neal, M.D., Eugene B. Rex, M.D., Clifton F. West, Jr., M.D., Appellees.**

Superior Court of Pennsylvania.

Argued Dec. 9, 1976.

Decided April 28, 1978.

354

Joseph D. Shein, Philadelphia, for appellant.

Ralph L. Hose, Ardmore, for appellee, Lankenau Hospital.

John C. Bonner, Norristown, for appellees, Neal, M.D., and West, Jr., M.D., A. Grant Sprecher, Philadelphia, for appellee, Rex, M.D.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is a medical malpractice case. Appellant, who was plaintiff below, appeals from the lower court's refusal to take off nonsuits in favor of two of appellees, Dr. Clifton F. West, Jr. and Lankenau Hospital, and from the court's refusal to grant a new trial as to appellee Dr. Eugene B. Rex.

On Saturday evening, August 28, 1965, appellant, while attending a wedding reception, ate a roast beef sandwich. A large piece of the beef got stuck in the lower part of his throat, substantially blocking it, although liquids could get by. The next day, Sunday, August 29, at noon, appellant went to Lankenau Hospital, where he was examined by appellee Rex, an otolaryngologist and esophagoscopist. That afternoon the doctor performed an esophagoscopy, which was completed by 5:00 p. m. During the procedure, a screw on a forceps that the doctor was using somehow got loose, making the instrument unworkable. The doctor testified that after the operation he checked for a possible puncture of the wall of the esophagus, for a puncture would have presented a serious danger of infection, but that he found no indication of a puncture.

After awakening from anaesthesia, appellant had no complaints. By 6:30 p. m., however, he was suffering abdominal cramps, a symptom of, among other ailments, a punctured esophagus. Dr. Rex was notified; he telephoned a general surgeon, appellee West, who examined appellant and ordered X-rays. Dr. West was not told that the forceps had malfunctioned. He left the hospital at 11:00 p. m., having given orders that appellant's vital signs should be monitored, and that appellant should be transferred to the main surgical floor for observation. The transfer took place at 4:00 a. m. Monday. At that time appellant's temperature had risen from 100.4 degrees at 8:00 p. m. to 100.6 degrees. Dr. West examined appellant again at 7:00 a. m. Monday. Appellant's temperature was 101.6 or 101.8, and his condition had generally worsened. The doctor made a diagnosis of a perforated esophagus, and ordered antibiotics to be administered. The hospital records do not show the antibiotics being administered until 12:30 p. m. By then an infection had set in, from which appellant suffered lingering complications, including multiple operations, and a meningeal stroke, with severe disability following.

Appellant brought suit against Dr. Rex, Dr. West, a Dr. Hunter S. Neal, and Lankenau Hospital. At the conclusion of appellant's case nonsuits were granted in favor of Dr. West, Dr. Neal, and Lankenau Hospital. Later, in submitting the case against Dr. Rex to the jury, the trial judge refused to submit the issue of timely administration of the antibiotics. The jury returned a verdict in favor of Dr. Rex.

On this appeal, appellant does not challenge the grant of a nonsuit in favor of Dr. Neal. He does, however, ask that we grant him a new trial against Dr. Rex, Dr. West, and Lankenau Hospital, and in support of this request he assigns several errors.[1]

1. The appeal is from the lower court's order of April 8, 1976, denying appellant's post-trial motions. On Aug. 30, 1976, the trial judge filed an opinion that did not support the order of April 8 but instead concluded that there should be a new trial as to Dr. Rex and Dr. West. On Sept. 1, 1976, the judge entered an order dated Sept. 7, 1976, rescinding the April 8 order with regard to the two doctors,

 Appellant's first argument concerns the composition of the jury. A prospective juror was the daughter of a deceased physician and initially indicated she liked doctors, "and I have never come against one that I don't like." N.T. at 49. She said that in a close case this attitude might tip her opinion. Upon further questioning, however, she said she could render a verdict that would be unbiased and based on the facts. Appellant's counsel challenged her for cause. When the trial judge denied the challenge, counsel used a peremptory challenge. Counsel used all his peremptory challenges, and was therefore unable to strike another juror whom he wished to strike peremptorily. The judge, however, moved that juror to second alternate, and the juror had no part in deciding upon the verdict.

Most of the argument to us has concerned whether the challenge to cause was properly denied. However, we need not decide that issue. If we assume that the challenge was improperly denied, still, appellant has shown no prejudice from the impropriety. There is nothing to suggest that the jury he had was not an impartial jury; and the juror he wished to strike but could not did not participate in the decision.[2]

who thereupon filed a petition for a writ of prohibition with this court. Since the Sept. 7 order was beyond the jurisdiction of the court, Pa.R.A.P. 1701(a), on Sept. 23, 1976, the petition was granted, although we did not strike the court's opinion.

2. Indeed, at trial appellant's counsel recognized as much, as appears from the following:

THE COURT: Mr. Shein, I make the suggestion, that is that we could take number thirteen (13) juror and move number thirteen (13) down to the second alternate juror since no one has struck number thirteen (13).

We will move him down to second alternate and if we need the juror then we are going to have to take the juror based upon my overruling your challenge for cause. And if the presence of the second alternate is not necessary then you won't be hurt by my ruling.

Do you agree to that?

MR. SHEIN: Yes, sir.

2

■ Appellant's second argument concerns the trial judge's refusal to submit to the jury the issue of whether appellees Rex and West were negligent for their failure to administer antibiotics earlier.

Appellant called an expert witness, Dr. Charles M. Thompson, to testify as to the standard of care required under the circumstances. In response to questions by appellant's counsel, the doctor testified:

Q. Doctor, as of August of 1965 were you familiar, sir, in the Philadelphia area with the general standard of care, that is how a doctor, a reasonable doctor firstly, one who is an otolaryngologist, bronchoesophagologist, would conduct himself with regard to diagnosis and treatment of a ruptured esophagus?

A. Yes.

Q. Now Doctor, I'm going to ask you a hypothetical question and I want you to assume, sir, that every fact in my hypothetical question is true, if you will.

When I conclude that question, sir, I will ask you an opinion.

Now Doctor, I want you to assume that one defendant, Rex, as of August 29, 1965, had been an otolaryngologist and bronchoesophagologist for approximately thirteen (13) years. That on August 29, 1965, he performed an esophagoscopy at approximately 4:00 P.M. upon the plaintiff in this case, Stephen Brannan, during which procedure the forceps broke, otherwise described by him as a screw coming loose, while the forceps were in the esophagus. That the Doctor was not certain whether at that point the forceps touched the esophagus, that is the wall, but didn't think there was a puncture; that the operation was concluded somewhere before 5:00 P.M.; that initially all vital signs were normal; but that by 6:25 P.M. on that same day it was recorded in the postanesthesia observation record that the patient had severe abdominal cramps and muscle tightness; that by 8:00 or 8:30 P.M. Dr. Rex was notified of this condition and in his own words felt that

quote there was a strong possibility of a perforation, end of quote; that he ordered the patient closely observed, nothing by mouth, telephoned a general surgeon to examine him, but at no time ordered any antibiotics despite his strong suspicion that he might have perforated the esophagus. Doctor, assuming these facts to be true, *do you have an opinion as to whether or not the failure to order antibiotics was below the standard of care required* of an individual of this man's experience and training having due regard to the advanced state of the profession at the time.

MR. SPRECHER [appellee Rex's counsel]: Objection

Q. Do you have an opinion, sir?

A. I do.

THE COURT: What is your objection?

MR. SPRECHER: All the facts in the hypothetical I don't believe, your Honor, are in evidence. And they also renew my objection as to this particular man's qualifications to testify as to the training and experience of an otolaryngologist and bronchoesophagologist.

THE COURT: Your objection is overruled.

BY MR. SHEIN

Q. What is your opinion, Doctor?

A. Reluctantly I say yes.

Q. You say yes to what?

A. That this did not conform with the standards of practice.

N.T. at 365–67 (emphasis added).

Dr. Thompson later testified as to appellee West:

BY MR. SHEIN [appellant's counsel]:

Doctor, I want you to assume that one defendant, West, as of August 29, 1965, had been a medical doctor for approximately thirteen (13) years; that on August 29, 1965, sometime in the evening at about 10:00 P.M. this Doctor was requested, being in the hospital at that time, to see a patient, Stephen Brannan, in consultation; that he was informed that the patient had severe abdominal pain and

that the patient had undergone an esophagoscopy late in the afternoon of the same day for a removal of a meat bolus; that he ordered x-rays and that he considered, after reading the films as one of the possibilities of the cause of the man's pain a rupture of the esophagus; in addition Dr. Rex told him that there might have been a perforation of the esophagus.

Now, Doctor, despite this knowledge he ordered no antibiotics until sometime after 9:00 A.M. the following morning.

Doctor, assuming these facts to be true, do you have an opinion as to whether or not the delay in ordering antibiotics was below the standard of care required of an individual of this man's experience having due regard to the advanced state of the profession at the time.

A. I do.

MR. BROWN [appellee West's counsel]: I renew my objection.

THE COURT: Objection is overruled.

Q. And what is your opinion, sir?

A. I'd say it was below the standards of the profession.

N.T. at 380–81.

Later, however, during redirect examination, Dr. Thompson testified:

BY MR. SHEIN:

Q. Doctor, I believe so that we understand this clearly, I asked you a question with regard to two doctors yesterday, a long hypothetical question, one with regard to Dr. Rex and the other with regard to Dr. West.

And in that question I asked you to assume certain facts. And one of the facts that I asked you to assume was that these doctors suspected a perforation of the esophagus.

Now, and I ask you, doctor, if a failure to administer antibiotics with that fact and with the other facts in my question severe abdominal cramps, muscle tightness, fell below the standard of care of individuals of this experi-

ence in the Philadelphia area and you answered it did. Am I correct, sir?

A. Yes, sir.

Q. And we are talking specifically about this case, aren't we, doctor?

A. Yes, sir.

MR. SPRECHER: Your Honor, I'm going to object. This is leading.

MR. SHEIN: I have no further questions.

THE COURT: Let me make one further proviso. *Did it fall below the standard as it existed in 1965?*

THE WITNESS: *I can't answer that. Ten years ago.*

BY MR. SHEIN:

Q. *Doctor, you answered that very question yesterday in the affirmative.*

A. *Did I?*

Q. Yes, sir, because my question to you—

MR. SPRECHER: Your Honor, this is leading. Mr. Shein assumed that statement.

THE COURT: Don't argue with the witness.

You may ask further questions but don't argue with the witness.

MR. SHEIN: I'm sorry.

BY MR. SHEIN:

Q. The last part of my question to you, doctor, and I will read it.

"Doctor, assuming these facts to be true, do you have an opinion as to whether or not the failure to order antibiotics was below the standard of care required of individuals of these mens' experience having due regard to the advanced state of the profession at that time." And you answered that: "Yes, sir."

A. I believe I did. Yes, I did.

Q. You believe you did?

A. Yes, sir.

MR. SHEIN: I have no further questions.

N.T. at 551–53 (emphasis supplied).

On cross-examination, Dr. Thompson had acknowledged that in 1965 there was a respected, if small, body of opinion that antibiotics should not be administered until a diagnosis of a punctured esophagus had actually been made—although in his opinion they should have been administered at the first suspicion of a punctured esophagus. It is arguable that the effect of this acknowledgment was to preclude the possibility that appellees Rex and West could be found negligent for their failure to administer antibiotics at the first suspicion of a punctured esophagus, for

> [w]here competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in his community. . . .
>
> *Duckworth v. Bennett,* 320 Pa. 47, 51, 181 A. 558, 559 (1935).

However, we need not decide whether the body of opinion acknowledged by Dr. Thompson was substantial enough to meet this test.

■ At this point it is necessary to note a distinction. Suppose a witness first says that A is true, and then later, either on cross-examination or in response to a question from the court, modifies or qualifies this statement, as for example by acknowledging certain weaknesses in the basis of his belief. For a fact witness, a typical case is where the witness says he knows A happened because he saw it happen, and then acknowledges that his opportunity to see it happen was limited; but then on redirect the witness says that he still thinks A did happen. For an expert witness, a typical case is where a witness says his opinion is X because of his experiences with the sort of case at hand, and then acknowledges that another expert on the basis of his experiences might arrive at a contrary opinion; but then on redirect the witness says that even so he believes his opinion to be the correct one. In such cases it is for the jury to decide what weight if any to assign to the testimony. The point to be noted is that this case is not such a case. After

telling the trial judge—contrary to his earlier testimony—
that he *could not* say that the failure to administer antibiot-
ics earlier had been in violation of the standard of care as of
1965, Dr. Thompson did not go on to reaffirm or to offer any
support for his earlier statement that there *had* been a
violation of the standard of care as of 1965. Thus the jury
was left with a witness who first said he could say A, and
then said he could not say A.

In fairness to Dr. Thompson, it should be noted that his
withdrawal of his earlier testimony may have resulted from
an initial misunderstanding. The two hypothetical questions
put to him during direct examination did not focus his
attention on 1965 as sharply as they might have, rather
vaguely asking for his opinion "having due regard to the
advanced state of the profession at the time." (N.T. 365–67,
380–81; for the complete questions *see* pages 4–6, *supra.*)
Indeed, at one point on cross-examination the doctor indi-
cated that some misunderstanding *had* existed:

Q. I see, sir, but you realize that this case is being tried
although in 1975 with the knowledge or such be tried with
the knowledge which was opened to the medical profession
in 1965. You recognize that, do you not?

A. *I recognize that now.*

N.T. 542; (emphasis added).

In light of this answer it is perhaps not surprising that when
the trial judge specifically asked Dr. Thompson about his
ability to testify as to 1965, the doctor felt obliged to say
that he could not.[3]

3. In his opinion, which reflects his change of mind after trial, *see*
footnote 1, *supra,* the trial judge argues that the doctor's later
testimony was not a complete contradiction of his earlier testimony:
 In looking at the testimony in the light most favorable to the
 plaintiff . . . [t]he testimony was directed toward whether
 there were two schools of thought concerning when antibiotics are
 to be administered . . . . Dr. Thompson's seemingly contra-
 dictory statement expressed the opinion that he did not know
 whether in 1965 a small recognized body held that a diagnosis of a
 perforated esophagus must be made before starting antibiotics.
 Lower court's opinion at 6.
 We, too, have read the testimony in the light most favorable to
 appellant, but we cannot understand it to mean anything other than

■ Given Mr. Thompson's withdrawal of his initial opinion regarding a violation of the standard of care as of 1965, there was nothing to go to the jury. A jury should not be required to guess which of two contradictory opinions offered by a party's expert witnesses it should choose. *Commonwealth v. Gonzales,* 463 Pa. 597, 345 A.2d 691 (1975); *Menarde v. Phila. Transp. Co.,* 376 Pa. 497, 103 A.2d 681 (1954); *Mudano v. Phila. Rapid Transit Co.,* 289 Pa. 51, 137 A. 104 (1927); *Fady v. Danielson Const. Co.,* 224 Pa.Super. 33, 302 A.2d 405 (1973). The trial judge therefore correctly refused to submit to the jury the issue of whether appellees Rex and West were negligent for their failure to administer antibiotics earlier.

3

■ Appellant's claim against Lankenau Hospital is based on the contention that during the night after the operation the staff was under instructions to call Dr. West if there was any change in appellant's condition, but no one did, although appellant's condition was worsening. However, the only change in appellant's condition noted between 8:00 p. m. and 4:00 a. m. was a rise in his temperature of 0.2 degrees. There is no evidence that this change was so alarming as to justify finding that the staff was negligent in not calling for help. It is true that when Dr. West examined appellant at 7:00 a. m., he found appellant's temperature was up by a degree or more, and that "his condition had changed considerably." N.T. at 180. Nonetheless, these facts could not support a finding of negligence, especially since appellant failed to introduce any expert testimony as to what the applicable standard of care was, *i. e.,* how frequently an examination of appellant should have been made, and whether the doctors should have been called. Dr. West testified several times that the staff was on notice to call him if there was any change, and that that was a standard procedure at Lankenau. Without more than this,

what the trial judge at the time, and in his charge to the jury, thought it meant—a complete contradiction.

however, the jury could not know whether failure to follow Lankenau's procedure, if indeed there was such a change in appellant's condition as to warrant a call under that procedure, constituted negligence. With no testimony on the applicable standard of care, the jury's verdict would have been conjecture. *Donaldson v. Maffucci,* 397 Pa. 548, 156 A.2d 835 (1960), *Carl v. Matzko,* 213 Pa.Super. 446, 249 A.2d 808 (1968).

### 4

▪ Appellant's remaining two arguments (which will be treated together) concern his claim against appellee Rex. Appellant's counsel was prevented by the trial judge from cross-examining the doctor with the use of a medical article entitled "A New Treatment for Esophageal Obstruction Due to Meat Impaction." The article reviewed case histories involving the use of an enzyme treatment, eliminating the need for surgery. Counsel's purpose was to develop the possibility that the doctor had an alternate method of treating appellant, and to show that therefore appellant did not give his informed consent to the operation.

Reference to a publication may be permissible to show that an expert witness is unaware of the contents. *Cummings v. Nazareth Borough,* 430 Pa. 255, 242 A.2d 460 (1968) (reference to literature on safe depth of pool diving areas allowed to show that borough's agents in charge of pool had never investigated what a safe depth would be); *Evanuik v. University of Pittsburgh,* 234 Pa.Super. 287, 338 A.2d 636 (1975) (publication permitted to show expert is unfamiliar with literature in particular field, but only if other evidence shows literature is universally accepted by authorities in the field as a standard work). An expert witness may be cross-examined on the contents of a publication he has relied on in forming his opinion, *Evanuik v. University of Pittsburgh, supra,* and on any other publication he acknowledges to be a standard work in the field. In such cases, the publication or literature is not admitted for the truth but only to affect the weight to be given the witness's testimony. *Ruth v. Fenchel,* 21 N.J. 171, 121 A.2d 373 (1956).

The article in question was twenty years old at time of trial. When shown the article, appellee Rex refused to acknowledge it as either reliable or as an authority, since he had not read it. When he was given time to read it, he did so, and said he disagreed with its conclusions. The trial judge then prohibited cross-examination as to what it was he disagreed with.

It is evident that the cross-examination could not be justified on the basis that appellee Rex had either relied upon the article, or had acknowledged it as authoritative. We do not reach the question of what if any difference it makes that appellee Rex read the article at trial, because we find that appellant's counsel was not, as he claims in his brief, deprived in any significant way of the opportunity to develop the possibility that the doctor might have used the enzyme treatment in caring for appellant. Appellant's counsel questioned his own expert witness at length on the treatment and its merits. N.T. 288–92. Also, he specifically asked appellee Rex about the treatment and his familiarity with it in 1965. N.T. at 767–69. The jury heard appellee Rex's reasons for not using the enzyme treatment generally or in appellant's case specifically. N.T. at 710–716. In these circumstances the jury was fully informed about and able to appraise appellant's contention regarding the enzyme treatment. The trial judge's ruling that counsel could not cross-examine appellee Rex about the article was well within the judge's discretion.

Affirmed.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

VAN der VOORT, J., files a dissenting opinion.

VAN der VOORT, Judge, dissenting:

I respectfully dissent. If the evidence presented by the plaintiff is believed it seems to me to clearly establish negligence and proximate cause as to Dr. Clifton F. West, Jr. I would remove the non-suit as to Dr. West, order a new

trial as to the action against him and would affirm the decisions in the lower court as to the other parties to the action.