Tolentino *v.* Bailey, Appellant, et al.

Argued March 26, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Edward R. Paul,* with him *Joseph G. Manta, James M. Marsh,* and *LaBrum and Doak,* for appellant.

*Marvin I. Barish,* with him *Freedman, Borowsky and Lorry,* for appellee.

OPINION BY CERCONE, J., September 23, 1974:

This appeal arises from a jury verdict and judgment for the plaintiff, Mr. Tolentino, in the amount of $225,000. The facts of this suit in trespass, cast in the light most favorable to the verdict winner, are as follows:

In October, 1962, the plaintiff and several other co-workers, while in the course of their employment with Continental Transportation Company, were told to unload the freight from the defendant Bailey's truck. The men routinely backed the truck up to the loading dock, put on the emergency brake, put the truck in reverse gear, and placed blocks of wood (chocks) in front of its rear wheels. They then laid a metal ramp from the docks to the inside of the truck, a distance of mere inches, and began to unload the 14,000 pounds of freight on board with a forklift. As the forklift proceeded up the ramp to the truck, the truck rolled forward approximately eight feet. The forklift, with the plaintiff operating it, fell between the truck and the loading dock pinning the plaintiff's right arm underneath the steering column. The plaintiff lay in great pain for nearly ten minutes before the forklift could be removed and the plaintiff taken to the hospital.

Two operations and several months in a cast proved only moderately successful, since the plaintiff thereafter experienced severe pain whenever he attempted strenuous work. Although the plaintiff returned to work at

Continental when his condition improved, he was unable to perform many functions of that arduous job because of the pain he experienced. The pain became so severe that he had to quit. Since that time he has only been sporadically employed. His difficulty apparently is that he cannot perform any task which requires rotation of his right arm and the application of pressure simultaneously.

The testimony indicated that the defective conditions of the hand brake and transmission, which the defendant had failed to repair or replace after due notice, caused the truck to roll forward under the momentum of the forklift rolling up the ramp.

Although the defendant alleges that many errors occurred at the trial which, either singly or cumulatively, require our granting him a new trial, we find no reversible error committed by the learned trial court below during the hotly contested litigation of this case. However, especially in light of the dissent by our Brother, Judge HOFFMAN, we do feel that one point raised by the defendant merits some discussion.

During the trial the defendant introduced Pennsylvania state inspection records which indicated that one month prior to the accident Bailey's truck passed inspection with only minor repairs. The truck's brakes were listed therein as "100%." In rebuttal, Tolentino called as a witness a former state inspection officer who testified, that as a result of his surveillance of that inspection station from April to May of 1963, it was decertified and its owner prosecuted for five separate instances of issuing inspection stickers without having conducted an inspection ("paperhanging"). Bailey strenuously objected to the admission of this testimony as irrelevant and highly prejudicial insofar as there was no evidence, he argued, that any fraud was involved in the inspection in question. Tolentino countered that the credibility of a business record could be impeached

by showing that its recorder had made fraudulent entries therein. See *Huffman Estate,* 349 Pa. 59 (1944); *Funk v. Ely,* 45 Pa. 444 (1863); *Weamer v. Juart,* 29 Pa. 257 (1857).

In his brief the defendant, Bailey, refers to the fact that the prosecutions involved in the decertification of the service station related to trucks much larger than his which could not have fit into the proprietor's garage to be properly inspected. Therefore, he argues, the decertification was irrelevant to the propriety of his inspection, and improperly implied without foundation that the defendant had received an inspection sticker without an inspection.[1]

First, we are not here concerned with an offer of *affirmative* evidence to prove a collateral issue for which no proper foundation has been laid. Rather, we are concerned with *rebuttal* evidence offered to diminish, by impeachment, the credibility or veracity of a business record in which a relevant entry appears. The law does not require that there be a direct relationship between the proved entry and those offered for impeachment. As the Supreme Court has stated:

"The only error we see upon the record is in excluding from the jury all evidence tending to impeach Ely's books, except such as related to the account against Funk. Such a rule of evidence amounts to nothing in its practical application.

"[I]t is competent for the adverse party to show [a business record's] *general character* by pointing to charges and entries affecting other parties, and by calling witnesses to prove such entries false and fraudulent." *Funk v. Ely,* 45 Pa. at 448-49. *Accord,* 5 Wig-

---

[1] The officer who conducted surveillance indicated a reason for prosecuting only for tractor-trailers. From his vantage point he could readily determine that "paperhanging" was going on because the big rigs could not be taken into the garage, and *no effort* was made to inspect them outside.

more on Evidence §1557 (3rd ed. 1940) ; 1 Henry, Pennsylvania Evidence §133 (1953).

When the defendant introduced the business records to establish, among other things, that hand brake failure could not have been responsible for the accident, he sought to rely on the "general character" of those records and their maker. He cannot complain now that he is tainted by the evidence undermining the character of the records upon which he sought to rely. In *Weamer v. Juart,* supra, the Supreme Court stated: "[W]hen the shopkeeper has through fraud or carelessness, made false entries, or omitted true ones, so frequently as to destroy the confidence of his customers in both himself and his books, what reason is there for insisting that a jury shall trust them." *Id.* at 259.

Since the Commonwealth decertified the inspection station *for all* vehicles, it clearly indicated that the proprietor of the station could not be trusted to properly inspect any vehicles, and the jury should be aware of that fact. While violations more proximate to the time of the defendant's inspection would have been desirable, they were not mandatory. The question of remoteness, which is basically one of relevance, is properly vested in the discretion of the trial court, and its decision thereon will not be reversed unless a clear abuse of discretion is shown.[2] See generally 5A C.J.S., Appeal & Error §1608 (1958) ; 2 P.L.E., Appeals §§418-19 (1957).

Both the remoteness of the violations and the fact that some distinction could be drawn between the un-

---

[2] In the instant case, the proprietor of the garage did not authenticate the records. Instead, the defendant called an employee of the Department of Transportation to authenticate them. For that reason, it was extremely difficult, if not impossible, to show violations more proximate to the time of the defendant's inspection. Since an effective cross-examination was foreclosed in this regard, the court could properly conclude that it should allow more leeway in rebuttal evidence than it might under other circumstances.

14

inspected trucks and the defendant's truck went to the probative value of the evidence; and, the probative value of a business record is a question for the jury. 2 Jones on Evidence §12:13 (6th ed. 1972). Consequently, the jury was entitled to receive and weigh evidence which bore upon its probative value.

Second, even if it were the case that more direct and less remote evidence of fraudulent entries should have been required if there were no other evidence that the defendant's inspection was improper, we would still affirm. The defendant is simply incorrect when he asserts that there is no evidence of record sufficient to indicate that his inspection in September of 1962 was improper, or that he knew it to be so. The mechanic at Continental who customarily worked on the defendant's truck testified that approximately six weeks after the inspection (two weeks after the accident) he replaced both the foot brake linings on the truck and the hand brake. Indeed, the hand brake was so badly worn that it was beyond the state of adjustment. He also testified that approximately nine weeks after the inspection (five weeks after the accident) he put a new transmission into the truck. Another witness testified that approximately one month before the accident the brakes had to be pumped to be operated, and the transmission frequently popped out of first and second gear. He told the defendant and others that he would not drive the truck until it was repaired. There was also testimony that prior to the accident the hand brake could be pulled back all the way with very little effort. Finally, there was expert testimony that it is impossible for three-year-old brakes to properly have a "100%" designation. Thus, even without the decertification testimony the jury may well have concluded that the inspection was not properly conducted.

The order and judgment of the court are affirmed.

DISSENTING OPINION BY HOFFMAN, J.:

Appellant raises numerous contentions of error in a trial which resulted in a jury verdict of $225,000.00 for personal injuries sustained by the plaintiff-appellee.

Plaintiff, a platform worker, was endeavoring to unload the cargo of a parked truck owned by the appellant, when the truck suddenly moved causing plaintiff to be pinned beneath a forklift truck upon the loading platform. It was testified at trial, and not disputed, that as a result of injuries sustained by the plaintiff to his right arm, his disability was permanent and any future heavy work precluded. After two related surgical procedures, plaintiff was caused to leave his employment because of continuing pain. A jury returned him $225,000.00 for compensation of his losses, and a court en banc denied appellant's post-trial motions. This appeal followed.

## Hearsay Evidence

First, it is contended that the trial court erred in admitting the testimony of two co-employees, who testified as to a number of conversations with the defendant Bailey and with two managers of Continental Trucking concerning the allegedly defective condition of the same truck involved in the mishap prior to the accident.

Generally, a person may not testify as to a conversation he had with a party to the action, where the testimony is admitted to establish the truth of the statement. Such an extra-judicial statement would be excluded on the basis of the hearsay rule. However, where the alleged conversations are admitted, not to establish truth, but to indicate that the party had notice of a condition or knowledge of certain facts, this has never been held to be hearsay, and is admissible.

Henry, *Pennsylvania Evidence,* §441; *Weglein v. Golder,* 317 Pa. 437, 177 A. 47 (1935). The trial court did not err in admitting the testimony of plaintiff's co-employees.

### Expert Opinion Evidence

Next, the appellant argues that it was error to admit the testimony of a safety engineer who, in rebuttal, opined that the accident was caused by the defects existent in the truck. On direct examination, a defense witness contended that this accident would have occurred even with a sound truck. Since a critical issue in the case was that of causation, and since the alleged defects did consist of matters involving "technical knowledge and experience beyond that of the average man," *Steele v. Shepperd,* 411 Pa. 481, 484, 192 A. 2d 397 (1963), it was proper to admit the opinion of an expert witness to establish causation. At time of trial, defense counsel did not object to this witness' qualifications. He may not now circuitously raise the issue by suggesting that the witness' testimony was not necessary. The witness was given a proper hypothetical question based on the facts developed in the record. The trial court correctly concluded the witness' testimony "was restricted to matters within his field of expertise, and involved an assessment of the mechanics of the braking system of the truck in relation to the size and weight of the truck, and the weight of the forklift driven by the Plaintiff." Having charged the jury adequately on the right to disbelieve all or part of the testimony of the expert witness on the basis of credibility, no error can be found with this contention.

### Status of State Inspection Garage

The last contention of error related to the appellant's liability centers around the admission at trial of

rebuttal evidence demonstrating that the garage which had inspected appellant's truck had its certificate of inspection suspended indefinitely because of "improper practices". Defense counsel objected to the introduction of this evidence as irrelevant and prejudicial. Despite the citation of cases permitting evidence of irregularities in accounts or records to impeach said records, the lower court relies on cases where the impeaching evidence was clearly linked to and discredited the validity or authenticity of the documents. See, *Funk v. Ely*, 45 Pa. 444 (1863); *Weamer v. Juart*, 29 Pa. 257 (1857); and, *Huffman Estate (No. 3)*, 349 Pa. 59, 36 A. 2d 640 (1944).

As part of its case, the defendants introduced inspection certifications indicating the satisfaction of minimal state safety standards. The accident occurred in October of 1962. Plaintiff was permitted to introduce evidence that in May of 1963 the Commonwealth had cancelled the certification of the inspection station because of "improper practices". The witness admitted that the decertification or any related investigation had not disclosed any impropriety with respect to the inspection of defendant's truck. In fact, the decertification arose because it was determined that the station had "inspected" trucks the size of which could not be adequately handled by the facilities operated by the station owner. Defendant's truck was not in the group of those trucks so classified.

On the basis of this evidence, improperly admitted, plaintiff's counsel in closing argument accused the defendant of having produced the inspection certificate "to mislead you, to confuse you . . ." and that they were trying to "get away with" something.

While the admission of evidence is generally within the sound discretion of the trial court, it is error to admit evidence which is in no way probative of some matter, but, in fact, acts to prejudice or mislead the minds

of the jury. *Velott v. Lewis,* 102 Pa. 326 (1883) ; *Geesey v. Albee Pennsylvania Homes, Inc.,* 211 Pa. Superior Ct. 215, 235 A. 2d 176 (1967). Since there was no evidence that the suspension of the inspection station was in any manner related to the inspection of defendant's truck prior to the accident, the admission of such evidence could only cause the jury to improperly speculate and conjure up some collusive relationship that issued a patently illegal certificate. The combination of this evidence and the comments of plaintiff's counsel was so prejudicial to the defendant's case, that a new trial is mandated.

## Evidence of Lost Earnings

Appellant contends that as an element of damages it was improper to admit the employment records of fellow employees to establish appellee's purported lost wages. This, appellant asserts, is even more compelling since the plaintiff voluntarily left defendant's employment.

It is apparent from the record that it was within the province of the jury to accept the testimony of the plaintiff and treating physicians that he stopped working for the defendant because of inability to continue with his disability. There is sufficient evidence to prove that the plaintiff did not voluntarily quit his employment, but was compelled to do so because of severe pain and inability to do heavy work.

The trial court admitted the records of co-employees who had worked at the same job and for approximately the same duration as the appellant. Because of his disability, the court properly introduced these records to demonstrate what plaintiff's earnings would have been if he could have continued in his capacity. Both Pennsylvania and Third Circuit cases support the admission of evidence of earnings of people who perform the job

which an accident precluded a plaintiff from performing. See, e.g., *Clark v. Butler Junction Coal Co.*, 259 Pa. 262 (1918); *Thompson v. Trent Maritime Co.*, 353 F. 2d 632 (3d Cir. 1965).

### Computation of Impairment of Earning Capacity

Appellant raises two contentions of error in the consideration of plaintiff's loss of earning capacity. First, appellant contends that it was error to admit computation charts but should have required the production of actuarial testimony on the subject from a qualified expert. While the appellant cites a number of Third Circuit opinions emphasizing the need to support claims of earning capacity impairment by actuarial testimony and tables, such policy is a matter of procedural law, and as such, we are not bound to follow. See, *Guaranty Trust Company v. York*, 326 U.S. 99 (1945).

Until 1964, the law of this Commonwealth was that the use of actuarial tables or testimony by an actuary was prohibited, and the introduction thereof constituted reversible error. *McCaffrey v. Schwartz*, 285 Pa. 561, 132 A. 810 (1926). That view remained viable until the case of *Brodie v. Philadelphia Transportation Co.*, 415 Pa. 296, 203 A. 2d 657 (1964). *Brodie*, while specifically overruling *McCaffrey*, stated that guidance could "be provided, at least in part, by permitting the use of accepted tables or the testimony of a qualified expert . . . ." 415 Pa. at 301. The Supreme Court emphasized that the reception of such actuarial evidence was permissible, and not mandatory. See also, *Jenkins v. Pennsylvania Railroad Co.*, 220 Pa. Superior Ct. 455, 458, 289 A. 2d 166 (1972).

Finally, appellant contends that the trial court's charge on reduction to present worth of damages repre-

senting future losses was inadequate, claiming that it was not analytical enough but made the matter entirely speculative. The Court's charge was a lengthy and painstaking delivery of the applicable law. Apparently, at time of trial, defense counsel could find no error or point needing further clarity, since he opted not to except to any portion of said charge. The jury in addition made no further inquiry into the manner of computation of verdict.

The Court's charge on present worth encompasses nearly three pages from the record. It is not merely an exposition of the law or definition of the legal terms. The trial court illustrated the computation by giving what is popularly called the "one dollar due in one year" example. He clearly explained the meaning of getting an amount for future losses today, despite the fact that the "loss" is not experienced until a time after the date of the trial. The trial judge stated that an award would yield the plaintiff certain interest on the money, if theoretically invested until such future date.

Reading the Charge of Court as a whole, and examining the cases in Pennsylvania on "present worth", there is nothing that requires the trial court to charge a jury with any greater degree of certainty than did the trial judge in the instant case.

Since it is impossible to say what weight the jury gave to the evidence introduced by plaintiff on the decertification of the inspection station (discussed, supra), the order of the court below should be reversed, and appellant granted a new trial.

PRICE, J., joins in this dissenting opinion.