454 A.2d 1012

Maria Bianco BALDINO and Raymond Baldino

v.

Armand CASTAGNA, M.D., Cibageigy Corporation and Morris Park Pharmacy.

**Appeal of Maria Bianco BALDINO.**

Superior Court of Pennsylvania.

Argued June 3, 1982.

Filed Nov. 19, 1982.

Reargument Denied Feb. 3, 1983.

Petition for Allowance of Appeal Granted June 2, 1983.

508

Tom P. Monteverde, Philadelphia, for appellant.

Sidney L. Wickenhaver, Philadelphia, for Ciba-Geigy, appellee.

Before HESTER, CIRILLO and JOHNSON, JJ.

CIRILLO, Judge:

Maria Bianco Baldino (appellant) appeals from a judgment entered in favor of appellee Ciba-Geigy Corporation (Ciba). The facts which gave rise to the instant appeal are as follows.

On November 27, 1973, appellant consulted Dr. Armand Castagna, a general practitioner, for treatment of lower back pain. After a brief examination, Dr. Castagna diagnosed her condition as an inflamed coccyx and prescribed Butazolidin-Alka (Butazolidin), a drug manufactured by Ciba. Appellant took the prescribed dosage for ten days and obtained relief. The pain re-occurred, however, and appellant telephoned Dr. Castagna and requested a prescription refill. The refill was granted over the telephone without any additional examination of appellant.[1]

In January, 1974, appellant consulted Dr. Herbert Lipkin, complaining of fatigue, sore throat, swollen glands and bruising. These symptoms are consistent with developing aplastic anemia which can be caused by Butazolidin treatment. Appellant did not inform Dr. Lipkin that she had taken this drug, however, because she was not aware of the significance of these symptoms. She was treated for a respiratory infection, but when her symptoms did not abate, Dr. Lipkin ordered blood tests. The results showed an abnormally low level of hemoglobin. Appellant was immediately admitted to the hospital and remained there for eleven days. During that time, her condition was diagnosed as aplastic anemia caused by Butazolidin.

Subsequently, appellant has had to receive blood transfusions every two months and consume male hormones which have deepened her voice and caused unsightly body hair. She has been ordered not to become pregnant because she does not have enough blood to support herself, and it would be fatal to her if she carried a child. Appellant has an 80% chance of dying from aplastic anemia. Appellant and her husband instituted the present action against Dr. Castagna,

1. Appellant consumed a total of thirty-three Butazolidin capsules over an eleven-day period.

Ciba and Morris Park Pharmacy. After a fifteen day jury trial, the jury found the following:

1. Butazolidin was a substantial factor in causing appellant to contract aplastic anemia;

2. Dr. Castagna was negligent in prescribing Butazolidin for appellant, or in failing to advise her to report any symptoms or side effects to him, or failing to comply with the prevailing medical standards for prescribing the drug;

3. Ciba did not negligently market the drug in such a way as to encourage physicians to prescribe it in instances where it was not medically appropriate, and Ciba did not negligently encourage physicians to prescribe Butazolidin without taking proper precautions.[2]

After appellant's post-verdict motions were denied, she filed the instant appeal.

■ Appellant's first contention on appeal is that the verdict in favor of Ciba was against the weight of the evidence and, as such, the lower court erred in denying her motion for a new trial. The law regarding appellate review of the grant or denial of a new trial on the ground that a verdict is against the weight of the evidence is well established in this Commonwealth:

[T]he decision to either grant or deny a motion for a new trial is within the sound discretion of the trial court and will be reversed on appeal only if the trial court palpably abused its discretion... [A] new trial should only be granted where the verdict is so contrary to the evidence as to shock one's sense of justice [and] ... not where the evidence is conflicting and the jury might have found for either party, nor where the trial judge might have reached a different conclusion on the same facts. (citations omitted).

*Myers v. Gold,* 277 Pa.Super. 66, 69, 419 A.2d 663, 664 (1980). *See also, Peair v. Home Association of Enola,* 287 Pa.Super. 400, 430 A.2d 665 (1981); *Jacob Kline Cooperage, Inc. v. George W. Kistler, Inc.,* 286 Pa.Super. 84, 428 A.2d

---

**2.** The jury also returned a verdict in favor of Morris Park Pharmacy. Appellant does not challenge the propriety of this verdict on appeal.

583 (1981). In determining whether a verdict is against the weight of the evidence, we must consider all the evidence, *Ditz v. Marshall*, 259 Pa.Super. 31, 393 A.2d 701 (1978), and not merely the evidence in the light most favorable to the verdict winner. If a court finds that the verdict is so greatly against the weight of the evidence as to shock the judicial conscience, it has the duty to disagree with the jury and to overturn its verdict, no matter how many new trials need be had in order to insure that justice is done. *Weaver v. Firestone Tire and Rubber Co.*, 267 Pa.Super. 548, 407 A.2d 45 (1979).

During the lengthy trial, it was established that Butazolidin is the brand name of a prescription drug, the generic name of which is phenylbutazone. Ciba has manufactured and marketed this drug since 1952. It is an anti-inflammatory medication used in the treatment of certain arthritic and rheumatic diseases. It does not attack the disease process itself, but rather, it provides symptomatic relief by reducing swelling and inflammation and alleviating the pain associated with these symptoms.

The principal medium for informing the medical profession about the nature and characteristics of prescription drugs is material published each year in the *Physicians Desk Reference* (PDR), which all doctors receive free of charge. The same information is provided in inserts furnished with each package of a drug supplied by the manufacturer. The contents of this prescribing information are closely regulated by the Federal Food and Drug Administration (FDA). In 1971, two years before Butazolidin was prescribed for appellant, the FDA required Ciba to modify its prescribing information for the drug and to include a new section on "warnings" which referred, for the first time, to "serious, even fatal blood dyscrasias," (aplastic anemia is a form of this disease), and added over thirty entries to the list of adverse reactions.[3]

3. The fact that Butazolidin is capable of causing adverse reactions, including aplastic anemia, was established in the instant case by articles and studies appellant obtained from Ciba's files and by other

Appellant attempted to show that the printed warnings which contained this information were, in effect, counteracted by the promotional and marketing methods Ciba employed to increase sales of Butazolidin. In marketing this drug, Ciba utilized promotional tactics common to the drug industry. These methods included the use of salesmen, known in the trade as detailmen, who visited physicians at regular intervals throughout the year. Ciba also published advertisements and articles in professional journals and corresponded with physicians through the mail.

Appellant introduced evidence to prove that Ciba's marketing methods were geared to lead physicians to believe that Butazolidin was safe for short-term use and that prior testing of a patient's blood to determine his propensity for blood dyscrasias was unnecessary in such a case. Four physicians who testified stated that the detailmen had made such representations to them. One of these physicians, Dr. Lipkin, stated that the detailmen informed him that if adverse side effects occurred, that they would disappear upon cessation of the drug.[4] A host of exhibits in the form of advertisements, and an article published by Ciba were introduced into evidence in support of this testimony. The advertisements carried the slogan, "If it doesn't work in a week, forget it!", implying that Butazolidin was safe for short-term use. While warnings were published in these multi-paged advertisements, they were left to the last page and were printed in miniscule type.

Additionally, during the trial, it was established that since Butazolidin afforded only symptomatic relief, yet had the potential to cause adverse side effects, that the FDA had limited the conditions for which Ciba could promote the drug. Appellant introduced testimonial and documentary evidence which showed that in 1973, the drug was being

sources. We also note that the jury reached this conclusion in returning a verdict in favor of appellant against Dr. Castagna.

4. Dr. Lipkin also testified that due to the detailmen's representation of the drug's safety for short-term use, he prescribed it for relatives, including his wife and mother, without conducting preliminary blood tests.

widely prescribed by general practitioners for conditions not provided for in the prescribing information, in an effort to prove that Ciba was encouraging physicians to ignore the warnings and prescribe the drug for general inflammatory conditions, without first trying other treatment, such as aspirin or other pain relievers. Appellant also produced documentary and testimonial evidence to the effect that in 1973 doctors were not being informed of the changes which had been made in the prescribing information in 1971. Appellant also attempted to show that the detailmen were an effective medium for conveying this information but, upon instructions from Ciba, the detailmen were not permitted to discuss this with doctors and were told to give evasive answers when doctors posed questions on side effects or the toxicity of the drug. Finally, appellant introduced documentary evidence which showed that despite the stronger warnings published in the prescribing information starting in 1971, that sales of Butazolidin increased steadily to the point where it became Ciba's number one seller, and that Ciba's advertising budget increased correspondingly with the rise in sales.

Ciba produced little evidence on the issue of whether it had negligently overpromoted Butazolidin. Two detailmen, who worked for Ciba in 1973, testified that they never told physicians that the drug was safe for short-term use and that they had informed physicians of both the 1971 changes made in the prescribing information and of adverse side effects associated with Butazolidin use. This testimony was contradicted by material printed in the training manuals which Ciba gave these detailmen. In these manuals, the detailmen were instructed not to tell physicians of the changes made in the prescribing information. Rather, they were instructed to leave "file cards", actually multi-page booklets which contained the new prescribing information and to "suggest" that the doctor review it at his convenience. When leaving these file cards, the detailmen were specifically instructed to tell physicians that the relationship between the adverse reactions mentioned in the file cards

and Butazolidin had not been conclusively established. Moreover, Ciba admitted that its detailmen were never provided with journal articles or reports on the topic of blood dyscrasias associated with the use of Butazolidin.[5]

Ciba's training manuals also contained hypothetical questions from doctors and suggested responses for the detailmen. One such scenario is as follows:

Doctor: I don't use Butazolidin, it is too toxic.

[Suggested Response:] Doctor, with Butazolidin-Alka, usually you get a response in three or four days and in many cases, you wouldn't have to use the drug for more than a week.

In none of the training manuals was it even intimated that the detailmen inform physicians of the importance of performing blood tests before prescribing the drug.

Mr. O. Darrell Hayes, Ciba's Vice-President of Sales, attempted to explain the discrepancy between the detailmen's testimony and the material contained in Ciba's training manuals.[6] He testified that whenever a doctor had a question regarding Butazolidin's toxicity, or adverse reactions that could result from its use, the detailmen forward-

5. The opening pages of these file cards also reinforced the notion that Butazolidin was safe for short-term use. For example, a booklet similar to the one given to Dr. Castagna in 1973 provided the following information on the first page:
PROMPT ANTI–INFLAMMATORY EFFECTIVENESS
Action usually evident within three or four days. Helps relieve pain and stiffness. Helps increase joint mobility.
SHORT TRIAL PERIOD
Only seven days. You don't wait a month for results—neither does your patient.
These booklets did contain information on adverse reactions, but it was printed in small type on the latter pages of the booklets.

6. There were other contradictions in the evidence that Ciba presented at the trial. One Ciba witness contended that the detailmen gave physicians adequate information on adverse reactions. Another Ciba witness stated that the detailmen were not qualified to discuss this matter with physicians. Ciba's National Sales Manager indicated, however, that the company only employed detailmen who possessed impressive qualifications. He testified that in 1973, "99%" of Ciba's detailmen were college graduates, that the "vast majority" had educations which included a background in the biological sciences, and that a "great number" were pharmacists.

ed the inquiries to Ciba who then addressed the physician's concerns. The following letter, dated November 8, 1973, is but one example of the manner in which Ciba responded to such inquiries:

Our sales representative, . . . has indicated your interest in documented cases of *aplastic anemia* associated with short-term (7–10 days) usage of *Butazolidin alka.*

During the treatment of individuals with Butazolidin alka, there have been reports of aplastic anemia, but their association with short vs long-term therapy has not been established. We are attempting to research this aspect and, therefore, require careful reporting and documentation of such cases. We would be interested to know if you have such a patient, and if so, please indicate the situation so that we are able to give you the necessary additional information you may require.[7]

Other examples of correspondence obtained from Ciba's files contained the same type of evasive, non-responsive replies.[8]

Ciba also produced as witnesses two specialists who practiced rheumatology who testified that they were not misled by the prescribing information or by the representations made by the detailmen, regarding the safety of the drug for short-term use or for conditions for which its use had not been approved by the FDA. One of them testified, however, that he read a great deal on the drug because he

7. The record contains a table which Ciba prepared, dated November 8, 1971, which reports cases of adverse reactions associated with phenylbutazone, the generic name for Butazolidin, dating from 1952. This table contained information on incidents of aplastic anemia associated with short-term use of this drug.

8. For example, in response to an inquiry from a physician, dated 1973, requesting information on the incidence of blood dyscrasias associated with Butazolidin treatment, Ciba cited a report from 1967 in which blood dyscrasias was reported at a rate of three cases per one million patients. Ciba concluded its letter to the physician with the statement, ". . . our blood dyscrasias incidents figures are quite low." Ciba offered no explanation as to why it responded to an inquiry from a physician with data that was six years old. Reports from 1971, 1972 and 1973 dealing with the subject matter of the physician's inquiry, were contained in Ciba's files.

prescribed it often in his specialized practice. Unlike appellant, Ciba offered no general practitioners as witnesses on this issue.

Ciba also disputed appellant's contention that Butazolidin was commonly prescribed for conditions for which its use had not been approved by the FDA. However, a situation analysis summary that Ciba prepared showed that in 1972, 33.9% of all the Butazolidin sold had been prescribed to treat conditions for which the promotion of the drug had not been approved by the FDA.

■ It is clear to this court, after a thorough review of the entire record, including the notes of testimony, that the evidence appellant produced was either not contradicted by Ciba, or was corroborated by material obtained from Ciba's files. As such, we find that the verdict in favor of Ciba was against the weight of the evidence. The judgment in favor of Ciba is, therefore, reversed and the case is remanded for a new trial.

■ Appellant's second contention is that the trial court improperly restricted the evidence she was permitted to introduce with respect to Ciba's overpromotion of Butazolidin, and adverse reactions to the drug. In the instant case, appellant was not permitted to introduce documentary evidence on these matters which pre-dated November, 1968, which was five years before Butazolidin was prescribed for her. Appellant maintains that she should have been allowed to introduce supplemental evidence on these matters for the years 1952 through 1967, an additional sixteen-year period. We disagree with this assertion. The introduction of evidence is controlled by the trial court, and its decisions in this regard will not be reversed on appeal absent an abuse of discretion. *Albert v. Alter*, 252 Pa.Super. 203, 381 A.2d 459 (1977). The exclusion of arguably relevant evidence is not erroneous where the admission of that evidence would serve to confuse or mislead the jury. *Lewis v. Mellor*, 259 Pa.Super. 509, 393 A.2d 941 (1978). In the instant case, it was incumbent on the trial judge to place

reasonable limits on the evidence to be presented. Even with the restrictions appellant complains of, the trial lasted for fifteen working days and produced five volumes of testimony in addition to a large amount of trial exhibits.

The trial court was flexible in permitting appellant to introduce pre-1968 evidence when it was necessary to do so in order to prove a point for which post-1968 evidence would have been inadequate. For example, appellant was allowed to introduce evidence of adverse reactions to Butazolidin for the years 1952 through 1973. It is clear, however, that the evidence that appellant argues it was error to exclude was merely cumulative to the evidence it was permitted to introduce at the trial. It is not error for a trial court to preclude a party from introducing evidence at a trial where that party has already introduced similar evidence of the same facts. *Eldridge v. Melcher*, 226 Pa.Super. 381, 313 A.2d 750 (1973). Therefore, the trial court did not err in restricting appellant's evidence in the instant case to a reasonable period of time. *Compare, Lambert v. Durallium Products Corp.*, 364 Pa. 284, 72 A.2d 66 (1950) (exclusion of evidence which might have affected the verdict was error); *Fox v. Cox*, 195 Pa.Super. 119, 169 A.2d 345 (1961) (error to exclude evidence which would establish a defense to action). *See also, Commonwealth ex rel. Amoroso v. Amoroso*, 212 Pa.Super. 94, 239 A.2d 878 (1978).

■ Appellant's third contention is that the trial court erred in refusing to admit into evidence a 1955 article published in the *New England Medical Journal* in which Ciba was criticized for overpromoting Butazolidin. We find this argument to be without merit for the reasons stated above and, also, because of the remoteness of this evidence. It is well established that questions of remoteness of evidence are properly vested in the trial court and its decisions in this regard will not be reversed on appeal absent a clear abuse of discretion. *Tolentino v. Bailey*, 230 Pa.Super. 8, 326 A.2d 920 (1974). The article which appellant claims was erroneously excluded from evidence criticized Ciba for promotional practices which were in effect more than eighteen

years before Butazolidin was prescribed for her. Under these circumstances, we cannot say that the trial court committed an abuse of discretion in refusing to admit this article into evidence.

■ Appellant's fourth contention is that the trial court erred in refusing to allow Drs. Lipkin and Castagna to testify that they changed their procedures for prescribing Butazolidin after they learned that appellant had contracted aplastic anemia. Appellant relies on *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971) in support of this assertion. *Incollingo* held that evidence of post-accident precautions is admissible for purposes other than proving a defendant's antecedent negligence so long as its use is qualified by proper jury instructions. Appellant argues that under this rule of law, her proffered testimony was admissible to show that the doctors had been misled by the detailmen and, had they been warned of the potential side effects of Butazolidin, they would have adjusted their prescribing practices accordingly. The admissibility of this type of evidence, however, was not contemplated in *Incollingo*. In that case, the Pennsylvania Supreme Court held that subsequent warnings of a drug manufacturer were properly admitted into evidence to show that it would not have been burdensome for the company to provide these warnings at an earlier time. In the instant case, the proffered testimony would have had no bearing on Ciba's actions with respect to its duty to warn doctors about the adverse side effects of Butazolidin.

■ Moreover, Drs. Lipkin and Castagna had already testified that the detailmen had misled them by misrepresenting the safety of Butazolidin for short-term use. As such, the proffered testimony on what they would have done had they been informed of the possibility of side effects was merely corroborative of their earlier testimony on this issue. As a general rule, prior declarations of a witness which are consistent with his in-court testimony are admissible to corroborate this testimony only where it is

alleged that the in-court testimony has been recently fabricated, or that the witness is testifying from corrupt motives. *Commonwealth v. Hutchinson,* 269 Pa.Super. 24, 409 A.2d 45 (1979). The decision of whether to admit such corroborative testimony lies within the sound discretion of the trial judge. *Commonwealth v. Gore,* 262 Pa.Super. 540, 396 A.2d 1302 (1978). In the instant case, there was no allegation of recent fabrication or corrupt motive on the part of the doctors. Therefore, the trial judge did not err in refusing to allow the doctors to testify that they altered their prescribing practices after learning that appellant contracted aplastic anemia.

Appellant's fifth contention is that the trial court erroneously allowed Ciba to introduce hearsay into evidence. This allegation involves the testimony of two Ciba witnesses who offered explanations of documents and graphs contained in Ciba's files.

The first witness, Dr. Martin A. Sternberg, Associate Director of Medical Services for Ciba since 1974, was permitted to testify as to the company's dealings with the FDA from the time Butazolidin was first introduced on the market in 1952, until the time of the trial. The second witness, Mr. Richard Hartman, Ciba's Senior Medical Research Associate, was allowed to testify about two graphs which were prepared at his request by Ciba employees prior to the institution of the present action. These graphs showed the trend of the ratio of adverse reactions to sales of Butazolidin for the years 1952 through 1972. This evidence was offered by Ciba on the issue of its duty to provide adequate warnings to doctors, in an attempt to show that when Ciba made its marketing decisions, it was operating under the belief that Butazolidin was safe and effective.

Ciba offered this evidence to rebut similar evidence appellant produced earlier in the trial. Appellant's evidence, which had also consisted of documents obtained from Ciba's files, was intended to show that when Ciba made its market-

ing decisions, it did not give due consideration to information it possessed regarding adverse reactions that could be caused by Butazolidin treatment.

■■■■ Hearsay evidence is defined as in-court evidence of an out-of-court declaration, whether oral or written, which is offered to show the truth of the out-of-court assertion. *Carney v. Pennsylvania Railroad Company,* 428 Pa. 489, 240 A.2d 71 (1968); *Commonwealth v. Landy,* 240 Pa.Super. 458, 362 A.2d 999 (1976). Such evidence is inadmissible unless it falls within an exception to the hearsay rule. *See, In re Gillen,* 236 Pa.Super. 521, 344 A.2d 706 (1975). In the instant case, however, it is clear that the testimony of Dr. Sternberg and Mr. Hartman was not offered to establish the accuracy of the documents they discussed while on the witness stand. Their testimony was offered solely to determine whether Ciba ignored information that it possessed regarding adverse reactions to Butazolidin when it formulated its plans for marketing the drug. As such, the testimony was not hearsay and was admissible on the issue of whether Ciba breached its duty to exercise reasonable care in providing warnings about the potential adverse side effects of Butazolidin. *See, Webb v. Fuller Brush Co.,* 378 F.2d 500 (3rd Cir.1967); *Mawn v. Civil Service Commission,* 17 Pa.Commw. 9, 330 A.2d 271 (1975). Therefore, the trial court did not err in admitting this testimony into evidence.

Appellant's final contention is that the lower court erred in reading, as submitted, Ciba's proposed point for charge number nine, which dealt with the law of negligence *per se.* The challenged point reads as follows:

All prescribing information for a prescription drug must be approved by the Federal Food and Drug Administration in accordance with the Federal Food and Drug Act. Such prescribing information for Butazolidin-Alka is contained in the PDR, package inserts, and other printed materials, [and] includes among other things, warnings as

to adverse reactions and warnings as to its use. You may consider the FDA's approval of such printed material as evidence that the warnings given by the defendant Ciba-Geigy Corporation in connection with this drug were adequate.

■ Appellant does not contend that this statement is incorrect as a matter of law but, rather, asserts that standing alone, the point could be construed as implying that the FDA's approval of the prescribing information established the adequacy of the warnings given. It is axiomatic that, in reviewing the adequacy of the jury charge, we must view the charge in its entirety. *McKay v. Philadelphia Electric Co.*, 447 Pa. 490, 291 A.2d 759 (1972). The primary function of a charge is to clarify the issues so that the jury may comprehend the issues they are to decide. *Crotty v. Reading Industries, Inc.*, 237 Pa.Super. 1, 345 A.2d 259 (1975). This court will not reverse on the basis that a portion of a jury charge is misleading if, taken in its entirety, the charge correctly states the applicable law. *McAvenue v. Bryn Mawr Hospital*, 245 Pa.Super. 507, 369 A.2d 743 (1976).

■ Reviewing the charge in its entirety, we find that it correctly stated the applicable law. While compliance with a law or regulation relieves the actor from liability under a theory of negligence *per se*, it does not establish, as a matter of law, that the actor exercised reasonable care. *Berkebile v. Brantly Helicoptor Corp.*, 219 Pa.Super. 479, 281 A.2d 707 (1971). In the instant case, the jury was informed that they could find Ciba negligent regardless of whether they found that the prescribing information for Butazolidin complied with the FDA's regulations. Therefore, appellant's contention that the jury was misled by the charge in the instant case is without merit.

Judgment reversed and case remanded.

JOHNSON, J., concurs in the result.