# Chajkowsky v. Wong

C.P. of Bucks County, no. 91-02407-19-2.

*Thomas B. Grier,* for plaintiff.
*Mark R. Zolfaghari,* for defendant.

LAWLER, *J.,* April 20, 1999—Defendant appeals the order of this court dated March 18, 1999, denying his motion for post-verdict relief. Pursuant to Pa.R.A.P. 1925(b), defendant has submitted a concise statement of matters complained of on appeal. This opinion is filed in accordance with Pa.R.A.P. 1925(a).

## BACKGROUND

At approximately 3 p.m. on March 31, 1989, Mrs. Irene Chajkowsky was involved in a motor vehicle accident. It took the rescue squad 30 minutes to extract her from her vehicle, as she was pinned beneath the dashboard and steering wheel. Mrs. Chajkowsky was then transported to the emergency room of St. Mary Hospital. Her blood pressure upon arrival was considered normal, but she complained of right hip and chest pain.

Defendant, Alfonso Wong M.D., was the attending physician in the ER of St. Mary Hospital when Mrs. Chajkowsky arrived. Dr. Wong ordered a chest x-ray, which showed multiple rib fractures and left hemothorax. The radiologist interpreting the films believed the hemothorax to be large, while Dr. Wong thought it to be small. Dr. Wong elected to monitor the hemothorax through observation of Mrs. Chajkowsky's vital signs, such as blood pressure, heart rate, breathing sounds, and mental status. Dr. Wong characterized her

condition as stable. At 6:35 a.m. on April 1, 1989, Mrs. Chajkowsky went into cardiac arrest. At 6:45 a.m., she was found unresponsive. After failed attempts at resuscitating her, Dr. Wong pronounced Mrs. Chajkowsky dead.

On March 26, 1991, plaintiff, George Chajkowsky, individually and as administrator of the estate of Irene Chajkowsky, commenced a medical malpractice action, alleging that defendant, Dr. Wong, was negligent in the care and treatment of Mrs. Chajkowsky. Specifically, plaintiff alleged that Dr. Wong failed to diagnose and treat a large left hemothorax and that this negligence contributed to Mrs. Chajkowsky's death.

Trial, which was bifurcated, began September 22, 1998. During the liability phase of the case, plaintiff's attorney produced surgeon Robert W. Driscoll D.O. as an expert witness. N.T., 9/22/98, p. 164. Dr. Driscoll offered opinions relating to defendant's management of Mrs. Chajkowsky. He discussed the existence of protocols and identified texts he considered to be authoritative regarding the treatment of a hemothorax. N.T., 9/22/98, pp. 188-96. The testimony was objected to by defendant's counsel, but the objection was overruled by this court. N.T., 9/22/98, p. 194. Finally, Dr. Driscoll offered his opinion regarding the manners in which defendant departed from the applicable standard of care. N.T., 9/23/98, pp. 29-41.

The attorney for defendant produced two expert witnesses during the trial. The first was Dr. Marvin Aronson, former chief medical examiner for the City of Philadelphia. He testified as an expert in the field of forensic pathology. N.T., 9/23/98, pp. 105-115. Dr. Aronson's testimony included his opinion regarding the cause of Mrs. Chajkowsky's death. N.T., 9/23/98, p. 111. Dr. Melvin A. Moses was also introduced as an expert

witness. N.T., 9/23/98, p. 151. He testified as to whether Dr. Wong's conduct was within the applicable standard of care. N.T., 9/23/98, p. 155. However, this court sustained objections to questions posed to Dr. Moses regarding Mrs. Chajkowsky's cause of death. N.T., 9/23/98, pp. 157-59.

On September 24, 1998, at the close of the evidence, the jury returned a verdict in favor of plaintiff and against defendant. After hearing testimony relating to damages, the jury awarded $1,501,700 under the Wrongful Death Act and $500,000 under the Survival Act. N.T., 9/24/98, p. 142.

## ISSUES ON APPEAL

In his statement of matters complained of on appeal, defendant asserts two points of error. First, defendant argues that this court erred when it allowed plaintiff's expert to testify regarding treatises and protocols. Second, defendant contends that this court erred in restricting defendant's expert from testifying on the cause of death issue. These two alleged errors, defendant argues, influenced the verdict of the jury such that a new trial is warranted.

## DISCUSSION

### 1. *No Hearsay Evidence Was Admitted Into Evidence Because the Standard of Care Was Not Established by Reference to Learned Treatises and Protocols*

Defendant argues that plaintiff's expert, Dr. Driscoll, introduced hearsay testimony into evidence. See concise statement of matters complained of on appeal at ¶1. It is defendant's contention that Dr. Driscoll introduced learned treatise testimony into evidence when he relied

on trauma protocols as substantive evidence for the standard of care of emergency room physicians. This alleged error, defendant maintains, influenced the verdict of the jury.

The testimony regarding protocols elicited from Dr. Driscoll by plaintiff's attorney begins at N.T., 9/22/98, p. 188:

"Q: Doctor, you mentioned earlier when we were talking about your background and your education protocols for treatment of certain trauma and I want to know first whether there were protocols which existed in March of 1989 for the management of hemothorax at a level two trauma center."

Defendant's counsel objected on the basis that protocols are not exemplary of the standard of care and that someone other than Dr. Driscoll was needed to testify that a protocol represented the standard of care. The objection was overruled. N.T., 9/22/98, p. 189. The direct examination of Dr. Driscoll resumed at N.T., 9/22/98, p. 189:

"Q: Going back to March of 1989 and talking about protocols, I guess first what I ought to ask you, what is a protocol in terms of managing trauma?

"A: Protocol is almost like a decision, what you do in the event of this, what do you do in the event of this, the patient presenting with following set of circumstance, with the history, what do you do? What is the next step? This is positive, do you do this, or do that?

"It is a standard way and that is part of the ATLS training course, what you do in these cases is just as simple as A, B, C, these are established in 1982, these trauma protocols—I think it was 1982 came out, when the Pennsylvania trauma systems foundation finally got

on the ball and started to—do you want to say something?

· "Defense attorney: I will let you finish.

"A: Started to organize the management of the trauma patient in the Commonwealth of Pennsylvania. They started establishing trauma center, level one which was certain criteria, level two somewhat less than level one, no level threes were ever designated. Yes, the protocols are there."

Defense attorney objected to the testimony and moved to strike on the basis that protocols were not mentioned in Dr. Driscoll's reports. N.T. 9/22/98, p. 190. The objection was overruled. N.T., 9/22/98, p. 193. The direct examination of Dr. Driscoll resumed at N.T., 9/22/98, p. 193:

"Q: Doctor, in March of 1989, was there a protocol for management of hemothorax at a level two trauma center?

"A: I can't produce a protocol but there has to be. This is the way these patients are managed, this is the way the ATLS course requires. Anyone who is a graduate of that course knows the protocols.·

"Q: Is that protocol something that is taught at the advanced trauma and life certification?

"A: It is taught at the advanced trauma life support center, advanced trauma life support course. It is in practically every textbook on the management of a trauma patient, it is in books on how to manage this and how you manage that. So if I—in April approximately 1986 were certified by advanced trauma life support I would have been taught that protocol.

"Q: In 1989 and specifically in March of 1989, were there any textbooks which you considered authoritative regarding the management of hemothorax?"

Defense attorney objected on the basis that Dr. Driscoll could not be asked to define an authoritative text and then use it. N.T., 9/22/98, p. 194. The objection was overruled, and plaintiff's attorney was told to elicit a yes or no answer. The direct examination of Dr. Driscoll continued at N.T., 9/22/98, p. 194:

"A: Were there text that I considered—

"Q: Authoritative in March of 1989 regarding the management of hemothorax?

"A: Yes.

"Q: Can you identify them, please."

This court overruled defense attorney's objection. N.T., 9/22/98, p. 195. The direct examination of Dr. Driscoll continued at N.T., 9/22/98, p. 195:

"A: It is pretty standard text out, I think it's called trauma, it comes out of the Boston city hospitals where the original ATLS—where all of the trauma management began by Adam Cooley (sic), it goes over so narrow—by so narrowly—injury case by injury case on how you manage it.

"Ken Banks (sic) out of Baylor who is chief of the emergency service and chief of the surgical service down there have recognized authority in the United States textbook on the management of trauma patients that deals in detail with what the presenting symptoms signs are, how to manage them.

"The ATLS textbook itself, which all graduates get, lists the protocols. And there is one or two surgical decision-making protocol books, protocol decision treatments, how you proceed with each of the stages.

"Most people practice in trauma surgery who graduate the ATLS know these cold and they are universally accepted to the best of my knowledge throughout the country.

"Q: Doctor, did you mention Maddocks?

"A: Ken Maddocks, yes.

"Q: And Cooley (sic)?

"A: Or Adam Cooley (sic), that is correct, Baltimore City Hospital.

"Q: And the ATLS program?

"A: The ATLS—American ATLS book of protocols this big.

"Q: You mentioned Norton?

"A: That is the author of one of the books. There are several of the protocol books, surgical decision-making I keep them in my library."

Defendant maintains that this line of questioning constituted hearsay in the form of learned treatise testimony. However, close scrutiny of the direct examination of Dr. Driscoll shows that no hearsay testimony was admitted into evidence.

It is well established that an out-of-court declaration constitutes hearsay if it is offered for the purpose of proving the truth of the matter contained in the declaration. See *e.g., Commonwealth v. Jones,* 530 Pa. 591, 615, 610 A.2d 931, 942 (1992); *Klischer v. Nationwide Life Insurance Co.,* 281 Pa. Super. 292, 422 A.2d 175 (1980). By contrast, an out-of-court statement is not hearsay when it is not offered for the truth of the matter asserted. See *e.g., Spotts v. Reidell,* 345 Pa. Super. 37, 42, 497 A.2d 630, 633 (1985); *Baldino v. Castagna,* 308 Pa. Super. 506, 454 A.2d 1012 (1982).

The statements made by Dr. Driscoll do not fall within the definition of hearsay. In the context of Dr. Driscoll's testimony, the "matter asserted" would be the establishment of the standard of care for an emergency room physician in treating a hemothorax. Although Dr. Driscoll made mention of protocols and treatises that are

authoritative regarding the treatment of a hemothorax, he never defined the standard of care. Dr. Driscoll merely stated what is a protocol, whether a protocol existed in March of 1989, and where the protocol may be found.

Defendant correctly points out that learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury. See *Majdic v. Cincinnati Machine Co.,* 370 Pa. Super. 611, 622, 537 A.2d 334, 339 (1988). However, that has not occurred in the instant case. Instead of testifying as to their substance, Dr. Driscoll merely identified the learned treatises containing the protocols or standards of care. The identification of these treatises was not for the purpose of establishing the standard of care of an emergency room physician in treating a hemothorax, since the standard was never actually established during the direct examination of Dr. Driscoll. Because the testimony did not have an impermissible purpose, this court allowed its introduction into evidence.

"It is the purpose for which the information is offered, not the manner in which it is introduced, which makes it objectionable." *Majdic,* 370 Pa. Super. at 622, 537 A.2d at 340. For instance, testimony where the expert witness read from or referred to a learned treatise has been deemed admissible where it was done for the purpose of supporting the witness' credibility. See *e.g., Nigro v. Remington Arms Co. Inc.,* 432 Pa. Super. 60, 80-81, 637 A.2d 983, 994 (1993) (where the court allowed a defense expert to read from a book he considered authoritative because the testimony had not been offered to prove the truth of the matter asserted but instead to support his credibility with regard to his expert opinion). Likewise, it has been held that an expert can rely on medical treatises as the basis for rendering an opinion.

See *e.g., Taliferro v. Johns-Manville Corp.,* 421 Pa. Super. 204, 216, 617 A.2d 796, 803 (1992). And, of course, learned treatises may be used to impeach expert witnesses. *McDaniel v. Merck, Sharp & Dohme,* 367 Pa. Super. 600, 622, 533 A.2d 436, 447 (1987).

In sum, Dr. Driscoll did not discuss the substance of the protocol or treatises. There was never any attempt to introduce the protocol itself, or any treatise, into evidence. The standard of care was not established by reference to protocols and treatises. Instead, Dr. Driscoll merely defined a "protocol," stated whether it existed at the time Mrs. Chajkowsky was admitted into the hospital, and explained where such protocols may be found. This testimony by Dr. Driscoll did not constitute out-of-court statements offered for the truth of the matter asserted. Consequently, this court permitted the testimony into evidence as it did not violate the hearsay rule.

## 2. Sustaining the Objection to the Testimony of Defendant's Expert Witness Was Not a Basis for a New Trial

Defendant contends that this court erred in restricting Dr. Moses from testifying on the issue of causation. See concise statement of matters complained of on appeal at ¶2. It is alleged that the preclusion of the expert testimony on causation severely prejudiced the defendant.

The direct examination of defendant's expert witness, Dr. Moses, was as follows:

"Q: Do you have an idea of what caused this woman's death?

"Plaintiff's attorney: Objection.

"The Court: Sustained.

"Q: Do you have an opinion as to the cause of death?

"A: Yes.

"Q: Can you tell me what that is?

"Plaintiff's attorney: Objection.

"The Court: Sustained.

"Q: In your review of the medical records and the autopsy, did you come to a conclusion as to the damage to this woman's heart?

"A: Yes.

"Q: Can you tell the jury what that conclusion is?

"A: Well, she had severe—she had three lacerations of her heart, the atrium and the ventricle which are large holes in the heart, which could cause massive bleeding.

"Q: And could this cause death?

"A: Yes.

"Plaintiff's attorney: Objection.

"The Court: Sustained. There is a way to ask a question of a medical expert and I'm assuming that you know how to do it, because the objections are to the form of your questions.

"Q: Fair enough. Sir, do you have an opinion as to the cause of death in this case?

"Plaintiff's attorney: Objection.

"The Court: Sustained.

"Q: Do you have an opinion within a reasonable degree of certainty to the cause of death in this matter?

"Plaintiff's attorney: I have an objection now as to cumulative testimony. He brought in a witness to testify solely to that issue.

460

"The Court: Sustained as to the form of the question." N.T., 9/23/98, pp. 157-59.

This court readily acknowledges that it misheard the last question asked of Dr. Moses. That is the reason the court sustained an objection to the question. However, this error is a harmless error, in which case there is no basis for reversal.

Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court, and may be reversed on appeal only when a clear abuse of discretion is apparent. *Lewis v. Pruitt,* 337 Pa. Super. 419, 428, 487 A.2d 16, 20 (1985). The exclusion of evidence is not grounds for the granting of a new trial if evidence of the same fact or facts was introduced by the party applying for a new trial. *Eldridge v. Melcher,* 226 Pa. Super. 381, 391, 313 A.2d 750, 756 (1973). There is no basis for a reversal and a new trial if the excluded evidence was cumulative in nature. *Soda v. Baird,* 411 Pa. Super. 80, 86, 600 A.2d 1274, 1277 (1991).

There are no grounds for a new trial in the instant case. Defendant complains that opinion testimony from Dr. Moses regarding the cause of Mrs. Chajkowsky's death was excluded. However, Dr. Moses' testimony was preceded by the testimony of Dr. Aronson. Dr. Aronson testified solely to the issue of Mrs. Chajkowsky's cause of death. See N.T., 9/23/98, pp. 106-111. Because Dr. Aronson had already testified on the cause of death issue, the excluded evidence was cumulative. As a result, the harmless error is not a basis for a new trial.

It is for the above reasons that the order of March 18, 1999 was entered.