537 A.2d 334

**Henry MAJDIC and Ann Majdic, his wife, Appellants,**

**v.**

**CINCINNATI MACHINE COMPANY, a/k/a Cincinnati Schafer Company of America, Appellee.**

Superior Court of Pennsylvania.

Argued March 9, 1987.

Filed Jan. 29, 1988.

612

Nicholas S. Mattise, Scranton, for appellants.

Stephen W. Saunders, Scranton, Pittsburgh, for appellee.

Before CIRILLO, President Judge, and BROSKY, WIEAND, OLSZEWSKI, DEL SOLE, MONTEMURO, TAMILIA, POPOVICH and JOHNSON, JJ.

DEL SOLE, Judge:

We consider an appeal from the judgment entered in Appellee's favor in a products liability action. Following the denial of post-trial motions and judgment, an appeal to this Court was filed in which a panel of this Court affirmed the trial court. We have granted reargument, however, for three principal reasons:

1. to clarify the role which "state of the art" evidence, including evidence of industry custom and federal safety standards, plays within the context of a strict liability action;

2. to re-examine the rule which prohibits hearsay statements appearing in learned treatises and other informational material from being admitted into evidence and used as substantial proof of the matters to which they relate; and,

3. to determine the admissibility of evidence of similar prior accidents to show constructive, post-sale notice of a defective product.

The underlying facts of this case are as follows. On April 20, 1978, Appellant–Henry Majdic (Majdic) was employed by National Standard Company. Majdic's duty on that date was to operate a power press which was designed, manufactured, and sold by Appellee–Cincinnati Machine

Company (Cincinnati). The power press was utilized to perform various functions in conjunction with the punching, stamping, bending, or sheering of metal. In operating the press, Majdic hand fed sheet metal between the dyes attached to the ram and bed of press, which shaped and formed the metal.[1] The procedure entailed further steps which necessitated Majdic to reach into the machine to remove the work in process at least ten times. The power press, however, was not equipped with a guard to prevent an operator's hands from coming in contact with the point of operation. Likewise, no safety feature was attached to bar the operation of the press while the user's hands were between the ram and bed. No warning signs were posted on the machine advising of the danger involved in exposing one's hands to the point of operation.

On the date in question, the ram of the power press descended upon Majdic's right hand as he operated the machine. Thereafter, on April 8, 1980, Majdic and his wife, Ann, commenced an action against Cincinnati, the manufacturer of the power press, for the injuries he received from the accident. Three theories of recovery were asserted: negligence, breach of implied and expressed warranties, and strict liability. The action, however, was tried solely on the strict liability theory. By his complaint, Majdic contended that Cincinnati had manufactured and sold the press in a defective condition. This averment was based on the Restatement (Second) of Torts § 402A.

It was Majdic's position at trial that the power press was defectively designed inasmuch as it did not contain a guard which would have prevented the operator's hands from entering the point of operation. In addition, Majdic claimed that the machine was defective since it was not equipped with a mechanism to prevent operation of the press while the user's hands were in the pinchpoint. Further, the lack of a warning of the danger involved in placing one's hand in

1. The ram was the mobile upper part of the machine, while the bed was the stationary lower part of the press.

the work area was cited as a ground for the claim of defective design.

During the course of trial, Cincinnati did not dispute Majdic's allegation that the power press had not been equipped with guards and warnings discussed, *supra*. Rather, Cincinnati maintained that the press brake was a general purpose, multifunctional unit which was unequipped with dies and had no point of operation when sold. Thus, Cincinnati claimed that only Standard Machine Company, which incorporated the press brake into its manufacturing system, could determine and install the guards and warnings necessary for the particular function assigned to the press. (Appellant's Brief, 12). Cincinnati posited that, for this reason, the responsibility for providing the guards and warnings rested solely with Standard Machine Company, Majdic's employer. The verdict returned by jury was in Cincinnati's favor. Majdic filed a Motion for a New Trial which contained assignments of error allegedly committed by the trial court in its evidentiary rulings.

Before beginning an analysis of the evidentiary rulings involved, it is important that we remain mindful of the broad and sound social policy which underlies a seller's liability as established by the Restatement (Second) of Torts, § 402A. Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) the rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The social policy sought to be effected by the implication of the seller's liability is very basic, very simple and very sound. As between an innocent user of a product and a manufacturer or seller who is engaged in the business of manufacturing or selling a product, risk of loss for injuries resulting from the use of a defective product shall be borne by the manufacturer and/or seller. *Salvador v. Atlantic Boiler Co.*, 457 Pa. 24, 319 A.2d 903, 907 (1974). *See: Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966) (§ 402A adopted as the law of Pennsylvania).

With this guiding principle in mind, one can readily analyze the application of liability under § 402A. In a product liability case, principles of negligence have no place. *Dambacher By Dambacher v. Mallis*, 336 Pa.Super. 22, 27, 485 A.2d 408, 428 (1984). Liability does not focus upon a manufacturer's reasonableness in the design or manufacture of the product. Nor does it concern the manufacturer's use of "state of the art" concepts. Rather, liability rests where there is a defect in the product which caused injury to the user. Whether or not the defect was known or could have been anticipated at the time of the design or manufacture is of no concern. *Id.*

Section 402A does contain the term "unreasonably dangerous," which arguably introduces negligence concepts into products liability cases. However, our Supreme Court has explained that that term was included within § 402A "to foreclose any argument that the seller of a product with inherent possibilities for harm would become 'automatically responsible for all the harm that such things do in the world.'" *Berkebile v. Brantly Helicopter Company*, 462 Pa. 83, 95, 337 A.2d 893, 900 (1975) (quoting Prosser, Strict Liability to the Consumer in California, 18 Hast.L.J. 9, 23 (1966)). Later, in *Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978), the term "unreasonably dangerous" was found to impose on the trial court the responsibility of determining "as a matter of law and by resolving considerations of 'social policy', whether 'the risk of loss should be placed upon the supplier.'" *Dambacher,*

*supra,* 336 Pa.Superior Ct. at 59–60, 485 A.2d at 426 (quoting *Azzarello, supra,* 480 Pa. at 556, 391 A.2d at 1025). We now consider the propriety of the evidentiary rulings challenged by Majdic on appeal.

## I. "State of the Art" Evidence

We are mindful that questions concerning the admission and exclusion of evidence are vested within the trial court's discretion. Absent an abuse of that discretion, such rulings will not be reversed. *Burch v. Sears, Roebuck and Co.,* 320 Pa.Super. 444, 456, 467 A.2d 615, 621 (1983). In assessing the propriety of the trial court's actions, a fundamental consideration in determining the admissibility of evidence is its relevance. Evidence is relevant if it tends to make a fact at issue more or less probable. *Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983).

Over Majdic's objection, Joseph L. Schwalje was permitted to testify concerning the custom in the industry in 1949 with respect to power press brakes. Cincinnati sold the press which injured Majdic to National Standard Machine in 1949. The witness testified that it was customary practice at that time for an employer or another party implementing the press brake into a metal forming system to provide the necessary safety devices. Further, Schwalje was permitted to refer to the 1973 American National Standards Institute (ANSI) Safety Standards for power presses to demonstrate that the standard in 1973 was the same as the trade custom prevalent in 1949.

At trial, Majdic argued that evidence of industry practices or trade customs was inadmissible in strict liability cases since it related to the reasonableness of a manufacturer's conduct. The trial court rejected this argument and found the testimony to be relevant as to whether the press brake was defective at the time it was sold to National Standard. The written 1973 ANSI reports were excluded from evidence; however, Schwalje was permitted to refer to them in order to determine the industry custom during 1949.

Recently, our Supreme Court in *Lewis v. Coffing Hoist Division, Duff–Norton Co., Inc.,* 515 Pa. 334, 528 A.2d 590

(1987), considered the identical issue presented by Majdic—the admissibility of custom and usage as well as industry standards in a products liability case. In *Lewis*, the plaintiff was injured while using a control box to operate an overhead hoist. The plaintiff stumbled and struck one of the control buttons, causing the overhead hoist chain to disengage, swing forward, and hit both of his legs. During trial, the trial court admitted the plaintiff's evidence that if the control box had been designed in a different fashion, the accident would have been prevented. The defendant attempted to put into evidence a publication of the American Society of Mechanical Engineers, which set forth standards with respect to the manufacture of electric hoists and other industrial lifting equipment. Likewise, the defendant sought to introduce evidence by an expert witness that at least ninety percent of the electric hoists manufactured in this country had control panels devoid of safety guards around the activating buttons. Both types of evidence were excluded by the trial court on grounds that such evidence injected into the case concepts of negligence. On appeal the Superior Court upheld the trial court's ruling and our Supreme Court affirmed.

In this bellwether decision, the Pennsylvania Supreme Court noted that there existed a general consensus among the various jurisdictions that the manufacturer's due care has no bearing in a products liability case. However, there is a discrepancy among the courts with respect to the relevance and admissibility of evidence demonstrating industry standards, customs and practices of the design of products. *Id.*, 515 Pa. at 342, 528 A.2d at 593. After embarking upon an analysis of the treatment of such evidence among our sister states, the *Lewis* court opined:

> [h]aving reached the conclusion that evidence of industry standards relating to the design of the control pendant involved in this case, and evidence of its widespread use in the industry, go to the reasonableness of the appellant's conduct in making its design choice, *we further conclude that such evidence would have improperly*

*brought into the case concepts of negligence law.* We also conclude that such evidence would have created a strong likelihood of diverting the jury's attention from the appellant's control box to the reasonableness of the appellant's conduct in choosing its design. For those reasons we conclude that the trial court correctly ruled the evidence to be irrelevant and hence inadmissible. *Id.,* 515 Pa. at 343, 528 A.2d at 594. (Emphasis supplied).

Further, the Concurring Opinion of Mr. Justice Larsen adds:

> [t]he injection of industry standards into a design defect case would be not only irrelevant and distracting, but also, because of the inherently self-serving nature of 'industry standards', would be highly prejudicial to the consumer/plaintiff. By our determination today, we have made it clear that a manufacturer cannot avoid liability to its consumers that it injures or maims through its defective designs by showing that 'the other guys do it too.'

*Id.,* 515 Pa. at 344, 528 A.2d at 595.

We are aware that there exists in Pennsylvania cases which have discussed, and even suggested, that custom or usage and state of the art, as well as similar matters, should be admissible in design/defect cases. It is abundantly clear that the rationale employed in this body of cases has been expressly rejected by *Lewis.* Likewise, to the extent that the dicta in the recent panel decision of this Court in *Foley v. Clark Equipment Co.,* 361 Pa.Super. 599, 523 A.2d 379 (1987) seems to suggest that a change in the law in this area would be desirable, we disapprove of that language.

■ For the reasons cited above, we reverse the trial court's decision to admit into evidence testimony concerning the custom in the industry during 1949 as it related to power brakes. Further, we hold that the trial judge improperly permitted evidence of the 1973 ANSI Safety Standards for power presses. Accordingly, we must remand this case for a new trial.

## II. The Use of Learned Treatises

At trial, Majdic presented the expert testimony of Paul Glasgow, a mechanical engineer, who testified that in his opinion the power press manufactured by Cincinnati had been defective because of the absence of safety guards. During Glasgow's testimony, Majdic sought to introduce into evidence various articles from trade publications and learned treatises which Glasgow had relied upon in forming his opinion. He also offered as evidence numerous patents which suggested the availability of safety guards at the time the power press had been manufactured. Although the trial court permitted Glasgow to refer to these materi‑ als, it refused to allow them to be received into evidence or their contents to be read to the jury.

The law in this Commonwealth is well-settled that an expert witness may be cross-examined on the contents of a publication upon which he or she has relied in forming an opinion, and also with respect to any other publication which the expert acknowledges to be a standard work in the field. *See: Cummings v. Borough of Nazareth,* 430 Pa. 255, 242 A.2d 460 (1968); *Walheim v. Kirkpatrick,* 305 Pa.Super. 590, 451 A.2d 1033 (1982); and, *Brannan v. Lankenau Hospital,* 254 Pa.Super. 352, 385 A.2d 1376 (1978), *rev'd on other grounds,* 490 Pa. 588, 417 A.2d 196 (1980). In such cases, the publication or literature is not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be accorded thereto. *Brannan v. Lankenau Hospital, supra,* 254 Pa.Superior Ct. at 365, 385 A.2d at 1383. Learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury. *See: McCormick on Evidence* § 321, at 899 (3d ed. 1984).

Under the current state of the law in this Common-wealth, it was entirely proper for the trial court to refuse to admit into evidence the treatises and patents offered by Majdic. Because these materials were being offered to

prove the truth of the matters asserted therein (i.e., that safety guards could have been added to the press in 1949), they were hearsay, and were inadmissible as substantive evidence. It was also proper for the trial court to refuse Majdic's offer to allow his expert witness to read the contents of the documents aloud in court. Excerpts from a publication which are read into evidence for the purpose of proving the truth of the statements contained therein are still hearsay and, therefore, inadmissible. This fact is not changed merely because the document is read into evidence by the witness instead of being received as an exhibit for inspection by the jury. It is the purpose for which the information is offered, not the manner in which is introduced, which makes it objectionable.

Majdic concedes that information contained in private treatises is hearsay. Nevertheless, he argues that we should adopt a more liberal view towards treatises and periodicals and allow their admission when relied upon by an expert. That decision, however, is not for this Court to decide; therefore, we decline this invitation.

■ With respect to the patents, the learned treatise exception has no application. The assurances of trustworthiness which are intrinsic in scholarly treatises do not exist where patents are concerned. Unlike learned treatises, patents are not necessarily propounded by an expert in the field in which the patent applies; rather, they may be obtained by any individual with an original idea. Moreover, they are not generally subject to the type of criticism and analysis which learned treatises usually undergo. In light of these circumstances, the trial court did not abuse its discretion either by refusing to admit the treatises and patents into evidence or by declining to allow portions thereof to be read to the jury.

### III. Prior Accidents

Majdic argues that the trial court erred by refusing to admit into evidence certain admissions by Cincinnati concerning 64 accidents that involved injuries to operators of

its press brake. All of these incidents occurred prior to Majdic's accident. This evidence was sought to be introduced to prove that Cincinnati was aware of the dangerous propensities of the machine, but did not warn of the dangers involved. The trial court disallowed this evidence and ruled that Majdic had failed to show that the prior accidents had occurred under similar circumstances to Majdic's incident.

It is established in this Commonwealth that a "defective condition" is not limited to defects in the design or manufacture of a product. The test is whether or not the product is equipped with every element necessary to make it safe for use. *Berkebile v. Brantly Helicopter, supra,* 462 Pa. at 100, 337 A.2d at 902. In *Berkebile,* our Supreme Court noted:

> [o]ne such element may be warnings and/or instructions concerning use of the product. A seller must give such warning and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of his product. Restatement (Second) of Torts § 402A, comment *h.* If the product is defective absent such warnings, and the defect is a proximate cause of the plaintiff's injury, the seller is strictly liable without proof of negligence.

*Id.,* 462 Pa. at 100, 337 A.2d at 902.

A product's "defective condition" may be proven through circumstantial evidence such as the occurrence of similar accidents. *Cornell Drilling Co. v. Ford Motor Co.,* 241 Pa.Super. 129, 139, 359 A.2d 822, 827 (1976). Evidence of similar accidents occurring at substantially the same place and under the same or similar circumstances is generally admissible to prove a manufacturer's constructive notice of a dangerous or defective condition.[2] However, the admis-

---

**2.** Although there exists in Pennsylvania neither statutory nor case law on point discussing a manufacturer's *post-sale* duty to warn, we note that a trend has developed among our sister states which places such a duty on a manufacturer. *See* Allee, *Post–Sale Obligations of Product Manufacturers,* 12 Fordham Urb.L.J. 625 (1984) (collecting cases); and, Royal, *Post Sale Warnings: A Review and Analysis Seeking Fair*

sion of such evidence is tempered by judicial concern that the evidence may raise collateral issues which confuse both the real issue and the jury. These matters are vested within the sound discretion of the trial court. *Whitman v. Riddell,* 324 Pa.Super. 177, 182, 471 A.2d 521, 523 (1984). To constitute reversible error, a ruling on evidence must be shown to be erroneous and harmful to the complaining party. *Id.,* 324 Pa.Superior Ct. at 180, 471 A.2d at 521, quoting *Anderson v. Hughes,* 417 Pa. 87, 208 A.2d 789, 791 (1965).

■ During trial, Majdic sought to introduce into evidence certain admissions made by Cincinnati in reference to 64 accidents involving the same type of press brake which had injured him. Majdic's purpose in requesting the introduction of this evidence was to show that the mere occurrences of the 64 accidents served as notice to Cincinnati of the dangerous propensities of the unshielded press brake and that Cincinnati had the duty to alert those who used the machine to these dangers. In addition, Majdic maintained that the specifics of these accidents were unnecessary in presenting these admissions to the jury. The trial court disagreed, however, and ruled that the admissions were repetitious and lacked the required specificity as to whether the accidents were in fact similar to the circumstances under which Majdic was injured. We have reviewed the record of the instant case and find that the trial court did not err by excluding Majdic's proffered evidence. The admissions, as presented to the trial court, specified neither the exact circumstances under which the other accidents occurred nor in what manner they were similar to Majdic's accident. Clearly, the burden with respect to the admissibility of prior accidents was not sustained by Majdic. Therefore, we find that the trial court did not abuse its discretion in disallowing the admissions.

As pointed out, *supra,* Cincinnati conceded during trial that it had been aware of the hazards associated with the

*Compensation Under Uniform Law,* 33 Drake L.Rev. 817 (1983) (collecting cases).

use of the power press. Cincinnati argued, though, that since the power press was utilized as a component part of National Standard's larger metal forming system, the machine did not become dangerous until after it had been integrated. Therefore, National Standard, the buyer, was responsible for installing the necessary safety features and warnings commensurate to the particular function the power press served. Cincinnati essentially maintained that it could not be charged with the duty of apprising each buyer of the product's inherent dangers, given the wide array of purposes for which the machine was utilized.

■ We disagree. Although Cincinnati may have indeed expected its buyers to correct any safety hazards associated with the power press once it was consolidated within their manufacturing systems, a manufacturer's duty to warn of the dangers may nevertheless continue when it becomes cognizant that its buyers are not making the necessary safety adjustments to its product. It would be a question of fact for the jury to determine whether the product was safe absent sufficient instructions to its purchasers that safety guards and warnings should be attached to the power press upon implementation into a larger metal forming system. For this reason, we believe that on retrial it would be appropriate to permit Majdic to introduce evidence of similar accidents so that Cincinnati's claim that it was unnecessary to inform its buyers of the product's hazards after integration may be challenged. However, we emphasize that in order for such evidence to be admissible, it must be comprised of similar accidents occuring at substantially the same place and under the same or similar circumstances.

IV. Cross Examination of Richard Griesheimer

During trial, Cincinnati presented testimony of Richard Griesheimer, a staff engineer and former manager of engineering. On cross-examination, Majdic attempted to cross-examine Mr. Griesheimer concerning the discrepancy between answers to interrogatories which had been filed in

this case by Cincinnati and those which it had filed in a case in another jurisdiction. In the instant case, Cincinnati answered that it had no knowledge of injuries, other than Majdic's, resulting from the use of its power presses. By comparison, Cincinnati had filed answers to interrogatories in another action in which it listed approximately 60 separate incidents involving the power press, including Majdic's claim. Majdic attempted to use these inconsistencies to impeach Cincinnati's credibility on cross-examination.

"It is well-established that the scope and limits of cross-examination are within the trial court's discretion and the court's rulings thereon will not be reversed in the absence of a clear abuse of discretion or an error of law." *Kemp v. Qualls*, 326 Pa.Super. 319, 324, 473 A.2d 1369, 1371 (1984). After considering Majdic's arguments in support of the requested cross-examination, the trial court refused this line of questioning in light of its previous ruling which excluded evidence of prior accidents. The trial court opined that the materiality and relevance of the cross-examination would be outweighed by its resulting prejudice to Cincinnati.

█ We conclude that the trial court erred in prohibiting this line of questioning which went to Cincinnati's credibility. The totally different answers filed in the other action by Cincinnati were a proper subject matter for cross-examination on the issue of credibility. We find that the trial court could have restructured the questioning to ensure that the jury would not focus its attention on extraneous issues in light of the trial judge's previous ruling. Thus, we find that the trial court abused its discretion on this evidentiary matter.

The judgment is reversed. Case remanded for a new trial consistent with this Opinion.

WIEAND, J., files a dissenting opinion.

OLSZEWSKI, J., files a concurring and dissenting statement.

WIEAND, Judge, dissenting:

I respectfully dissent and would affirm the judgment entered in the trial court.

On April 20, 1978, Henry Majdic was injured during the course of his employment when the ram of the power press which he had been operating descended upon his right hand. Majdic commenced an action against Cincinnati Machine Company (Cincinnati Machine), the manufacturer of the power press, alleging, inter alia, that Cincinnati Machine was strictly liable under the Restatement (Second) of Torts § 402A [1] for manufacturing and selling the press in a defective condition.[2] In particular, he alleged that the press had been defectively designed because it did not contain a safety guard which would have prevented the operator's hands from entering the point of operation and because it was not equipped with a mechanism to prevent operation of the machine while the operator's hands were in the pinch-point.

Cincinnati Machine did not contest Majdic's allegation that the press should have been equipped with safeguards to prevent an operator from placing his or her hands within the point of operation. Rather, it was Cincinnati Machine's principal defense that it had no obligation to provide the safety features urged by Majdic. In this regard, Cincinnati

1. That section provides:
   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
      (a) the seller is engaged in the business of selling such a product, and
      (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
      (a) the seller has exercised all possible care in the preparation and sale of his product, and
      (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

2. Majdic also asserted theories of negligence and breach of implied and express warranties. The action was tried, however, solely on the theory of strict liability.

Machine showed that the press brake[3] which it had manufactured and sold to Majdic's employer, National Standard Company (National Standard), had not been a completed product, but had been only a general purpose, multifunctional unit, unequipped with dies and having no point of operation, which ultimately was to be incorporated into a larger metal forming system. Until National Standard had installed dies on the press and had incorporated it into the larger system, Cincinnati Machine argued, no protective barrier could have been installed. As a result, Cincinnati Machine maintained, responsibility for providing safeguards and warnings rested solely with Majdic's employer who had assembled the press.

The jury which heard the evidence returned a verdict for Cincinnati Machine. Majdic filed a motion for a new trial in which he alleged error in several evidentiary rulings by the trial court. Most importantly for our purposes, he questioned whether it was appropriate to allow a defense expert to describe the custom in the power press industry in 1949 (when the press in question had been manufactured) and to refer to a federal safety standard for presses which had been published in 1973. In addition, he challenged the trial court's refusal to allow his expert witness to read from learned treatises and patents which allegedly were relevant in determining whether the press which caused his injury had been defective. He asserted, moreover, that the trial court had erroneously excluded evidence of similar accidents involving Cincinnati press brakes which occurred after the press in question had been manufactured and sold to National Standard but before Majdic sustained the injury to his hand. The trial court found no error in its evidentiary rulings; and, therefore, denied Majdic's request for a new trial. Following entry of judgment on the verdict, a panel of this Court affirmed. We granted reargument for three principal reasons: to review the admissibility of evidence of industry customs and federal safety standards in this ac-

---

3. Press brakes generally are used to bend large sheets of metal, although they may also be adjusted to perform other functions such as punching and stamping.

tion; to re-examine the rule which prohibits hearsay statements appearing in learned treatises and other informational material from being admitted into evidence and used as substantive proof of the matters to which they relate; and, finally, to determine the admissibility of evidence of other accidents to show constructive, post-sale notice of a defective product.

## I. *Evidence of Industry Customs*

During trial, Cincinnati Machine called Joseph L. Schwalje to testify as an expert. Schwalje, a mechanical engineer, was questioned concerning the custom in the industry as it pertained to power press brakes in 1949, the year in which the brake sold by Cincinnati Machine to National Standard had been manufactured. He testified that the customary practice in 1949 was for an employer or other party incorporating a press brake into a metal forming system to provide the safety devices necessary to prevent the operator's hands from entering the point of operation. In support of this conclusion, Schwalje referred to a federal safety standard for power presses which had been published by American National Standards Institute (ANSI) in 1973 and which imposed the responsibility for providing point of operation guards on those who assembled metal forming systems rather than on the manufacturers of the press brakes. Although the established standard of 1973 was not in existence in 1949 when the press which injured the plaintiff had been manufactured, Schwalje opined, the trade practice prevalent in the power press industry in 1949 was the same as that reflected by the 1973 standard.

Majdic opposed Schwalje's testimony on two grounds. First, Majdic contended that evidence of industry-wide customs tended to focus attention upon the reasonableness of the manufacturer's conduct and, therefore, was inadmissible in an action based upon strict liability. Second, he argued that because the 1973 safety standard was not promulgated until twenty-four years after the press brake in question had been manufactured, Schwalje's testimony

with respect to the standard was irrelevant to a determination of the safety of the brake at the time of manufacture.

The trial court determined that the custom evidence introduced by Cincinnati Machine did not relate to the reasonableness of the manufacturer's conduct and was relevant in aiding the jury to determine who was responsible for adding the safety devices which all parties agreed were missing. The court excluded the 1973 written standard from evidence but allowed the expert to refer to it in order to elucidate the custom of the industry in 1949.

Custom in the industry refers to the common way things are done in an industry, or to a formal industry standard. See: Spradley, *Defensive Use of State of the Art Evidence in Strict Products Liability*, 67 Minn.L.Rev. 343, 344–345 (1982); Note, *Perpetuating Negligence Principles in Strict Products Liability: The Use of State of the Art Concepts in Design Cases*, 36 Syracuse L.Rev. 797, 816 (1985). Evidence of industry custom was originally used in negligence cases to prove that a defendant-manufacturer's conduct either was or was not unreasonable. See, e.g., *George v. Morgan Construction Co.*, 389 F.Supp. 253 (E.D.Pa.1975); *Forrest City Machine Works, Inc. v. Rayburn Aderhold*, 273 Ark. 33, 616 S.W.2d 720 (1981); *Varas v. Barco Manufacturing Co.*, 205 Cal.App.2d 246, 22 Cal.Rptr. 737 (1962); *Chown v. USM Corp.*, 297 N.W.2d 218 (Iowa 1980). See generally: Robb, *A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases*, 77 Nw.U.L.Rev. 1, 6–9 (1982).

Despite its negligence heritage, I am of the opinion that custom evidence is also relevant under the theory of strict products liability to determine whether a product is defective. In this Commonwealth, the determination of defectiveness is made through a two-step process. First, the trial court must engage in a risk-utility analysis to decide whether the imposition of strict liability would be justified; thereafter, the case is submitted to the jury to determine whether the facts of the case support the averments of the complaint. *Azzarello v. Black Brothers Co.*, 480 Pa. 547,

558, 391 A.2d 1020, 1026 (1978); *Foley v. Clark Equipment Co.*, 361 Pa.Super. 599, 606, 523 A.2d 379, 382 (1987). Evidence of industry custom is but one factor which may be considered by a court in balancing the risks posed by the product against its utility. This position has been explained most cogently by the United States Court of Appeals for the Fifth Circuit in *Carter v. Massey–Ferguson, Inc.*, 716 F.2d 344 (5th Cir.1983). There, Judge Garwood, in a lucid concurring opinion, stated:

> [E]vidence that a product's design conforms to or deviates from industry custom, though not dispositive, may nevertheless be relevant in determining whether the product is unreasonably dangerous under the risk-utility balancing test. That potential relevance may be two-fold. First, industry custom will usually tend to show the collective judgment of the industry on the subject, and in this respect it has the same character of relevance as a professional society standard, though the relevance is more attenuated since factors other than product safety are more likely to influence the custom than the standard. Second, it will in many instances, though by no means all, tend to show general user experience with and expectations of product handling or performance in respect to the design characteristics at issue; and frequently the extent of the risk actually posed by a given product design characteristic will be affected by the degree to which it causes the product's operation and performance to conform to general user experience and expectations. Whether in a given case industry custom is relevant under either of the above theories, and if so the degree of its probative value, will naturally depend, among other things, on the nature of the product, the particular design characteristics at issue and the industry custom.

*Id.* at 350 (Garwood, J., concurring) (emphasis in original).

Legal scholars who have considered the admissibility of custom evidence in strict liability cases agree that it is relevant insofar as it relates to the industry's perception of the danger associated with the use of the product. See:

Spradley, *supra* at 357–359; Keeton, *Annual Survey of Texas Law–Torts*, 35 Sw.L.J. 1, 11 (1981). The same or similar reasoning has been employed by the majority of jurisdictions in approving the admissibility of custom evidence in actions sounding in strict liability. See, e.g., *Carter v. Massey–Ferguson, Inc., supra; Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192 (4th Cir.1982); *Smith v. Minister Machine Co.*, 669 F.2d 628 (10th Cir.1982); *Wagner v. International Harvester Co.*, 611 F.2d 224 (8th Cir.1979); *Wisconsin Electric Power Co. v. Zallea Brothers, Inc.*, 606 F.2d 697 (7th Cir.1979); *Poland v. Beaird–Poulan*, 483 F.Supp. 1256 (W.D.La.1980); *Caterpillar Tractor Co. v. Ford*, 406 So.2d 854 (Ala.1981); *Sturm, Ruger & Co. v. Day*, 594 P.2d 38 (Alaska 1979), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *Deyoe v. Clark Equipment Co.*, 134 Ariz. 281, 655 P.2d 1333 (1982); *Anderson v. Hyster Co.*, 74 Ill.2d 364, 24 Ill.Dec. 549, 385 N.E.2d 690 (1979); *Chown v. USM Corp., supra; Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978); *O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298 (1983); *Friederichs v. Huebner*, 110 Wis.2d 581, 329 N.W.2d 890 (1983). See also: Ky.Rev.Stat.Ann. § 411.310 (Baldwin Supp.1982) (compliance with "generally recognized and prevailing standards" in an industry gives rise to presumption of non-defectiveness).

The law in Pennsylvania is an anomaly. A failure of a product to comply with industry standards is relevant to show that a product is defective. *Forry v. Gulf Oil Corp.*, 428 Pa. 334, 237 A.2d 593 (1968). Recently, however, the Supreme Court held in *Lewis v. Coffing Hoist Division, Duff–Norton Co., Inc.*, 515 Pa. 334, 528 A.2d 590 (1987) that industry standards are irrelevant and inadmissible to show that a product is not defective. Thus, industry standards are relevant and admissible for the purpose of showing that a product is defective; but if the product does comply with industry standards, that fact is irrelevant and inadmissible. Although we are obliged to follow the holdings of the Supreme Court, I continue to be of the belief

that the view adopted by a majority of courts is the better view. According to this view, industry standards are generally admissible in product liability cases, although not conclusive, to assist the factfinder in determining whether or not a product has been defectively designed.

In any event, *Lewis* is not controlling of the instant case. In this case, industry standards were not offered to show that the metal forming system was either defective or not defective. The manufacturer of the power press conceded that safeguards should have been added to protect those workmen who used the system. The manufacturer offered to show, however, that according to industry custom in 1949, when the power press had been manufactured, it was for those who assembled the metal forming system of which the press was only a part, and not the manufacturer of the press, to add the necessary safeguards. The reason was logical. Until the system had been assembled, the precise nature of the safeguards could not be determined. I would hold that industry custom was relevant and admissible for this purpose.

Almost identical factual scenarios were presented in two cases decided by the federal judiciary of Pennsylvania. In *Powell v. E.W. Bliss Co.*, 529 F.Supp. 48 (E.D.Pa.1981), *aff'd*, 681 F.2d 805, 808 (3d Cir.1982), the plaintiff had been injured when his hand became caught in the pinchpoint of a punch press. He commenced a product liability action against the manufacturer of the press brake, alleging that the press had been defective because it had not been equipped with safeguards which would have prevented the operator's hands from entering the work area and because it had lacked warnings regarding the danger of operating the press without such safeguards. The defendant-manufacturer did not dispute that safeguards were necessary; rather, it contended that the press brake which it had manufactured was not a completed product and, therefore, that it was not responsible for providing point of operation safeguards. The jury was instructed that if it found that the press as sold by the defendant-manufacturer was not a

finished product, it could consider evidence of industry custom in determining who was responsible for providing safety features. The District Court observed that the jury had not been charged that it could consider the evidence of trade custom as bearing upon the reasonableness of the defendant's conduct, but instead had been instructed that such evidence was to be considered only for the purpose of determining who bore the responsibility for installing safeguards on the press. *Id.* at 53. Because the charge "did not impermissibly 'ring of negligence,' " the court concluded, it was appropriate and not erroneous. *Id.*

Confronted with a set of facts which mirrored those in *Powell,* the United States District Court for the Middle District of Pennsylvania, in *Christner v. E.W. Bliss Co.,* 524 F.Supp. 1122 (M.D.Pa.1981), employed similar reasoning in upholding the admissibility of industry custom evidence in a case also arising under a theory of strict liability. The court noted that the evidence of trade custom had not been offered to prove due care, but rather to show that the absence of point of operation guards had not been the responsibility of the manufacturer. If the jury were to conclude that the power press was not a completed product when it left the defendant-manufacturer's control, the court said, it could then consider evidence of industry custom to assist it in determining who was responsible for providing point of operation guards. *Id.*

I would adopt the analysis of the federal courts. In the case sub judice, as in *Powell* and *Christner,* the custom evidence was not offered to demonstrate the exercise of due care by the manufacturer but only to show that the press brake was an incomplete product which, as the industry understood it, was to be completed by the assembler of a larger metal forming system who alone could design and provide safeguards appropriate to the assembled system. For such purpose, I would hold, the customs of the industry were relevant and admissible as an aid in determining whose responsibility it was to add the safeguards for the completed system.

## II. *Evidence of Governmental Regulations*

In actions based upon strict liability, the almost universal rule is that compliance with governmental standards, rules and regulations constitutes evidence of the adequacy of the product's design, and is therefore admissible, though not conclusive. See: Spradley, *supra* at 367 (collecting cases). This is also the law in Pennsylvania. See: *Jackson v. Spagnola,* 349 Pa.Super. 471, 503 A.2d 944 (1986); *Berkebile v. Brantly Helicopter Corp.,* 219 Pa.Super. 479, 281 A.2d 707 (1971).

Instantly, the defense expert offered by Cincinnati Machine was allowed to refer to an ANSI standard for power presses which had been published in 1973 in order to describe the custom within the power press industry in 1949. Evidence that the press brake manufactured by Cincinnati Machine was in compliance with governmental standards would, of course, be pertinent to the issue of defectiveness and, accordingly, would be admissible for that purpose. It is Majdic's contention, however, that the standard was irrelevant because it was promulgated twenty-four years after the press brake had been manufactured. He argues, therefore, that it was error to permit any reference to the 1973 standard.

In resolving this issue, the decision in *Powell v. E.W. Bliss Co., supra,* is once again instructive. There, the defendant-manufacturer was permitted to introduce into evidence the 1971 ANSI standard which, like the 1973 standard at issue here, placed the responsibility for installing point of operation safeguards upon the employer. The plaintiff contended that because the standard had been promulgated in 1971, it was irrelevant to the issue of whether the press was defective when it was manufactured in 1954. The court rejected this argument, stating:

> The 1948 A.N.S.I. standards, which were in effect when the press was manufactured, did not explicitly place the responsibility for providing such safety devices upon any one party. Hence, the express mandate of the 1971 standards placing this obligation on the employer was

relevant to the jury's determination in that it served to clarify the somewhat ambiguous standards promulgated in 1948.

*Id.* at 54. Similarly in the instant case, Cincinnati Machine's expert alluded to the 1973 ANSI standard to clarify the 1949 standards. This testimony was relevant in determining the custom within the power press industry at the time the press brake in question was manufactured.

I am not able to perceive that this caused any prejudice to Majdic. The standard itself was not admitted into evidence; rather, Schwalje was merely permitted to refer to the standard in explaining his opinion concerning the custom in the industry in 1949. The trial court expressly instructed the jury that it could consider the testimony only for that purpose, and not as evidence that the 1973 standard itself was in effect in 1949. Under these circumstances, the testamentary reference to the 1973 ANSI standard was harmless.

### III. *Admissibility of Learned Treatises*

I agree as fully as if I had written myself the majority's discussion regarding the use of learned treatises. It is worth noting, however, that other jurisdictions have promulgated rules or enacted statutes which adopt in whole or in part the learned treatise exception to the hearsay rule embodied in Federal Rule of Evidence 803(18).[4] See: Ala.

**4.** Fed.R.Evid. 803 provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> **(18) Learned treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

This exception to the hearsay rule is founded on the belief that, although the material contained in such literature is technically hearsay, there are compelling reasons which favor admitting such evidence under limited circumstances. These reasons have been summarized as follows:

Code § 12–21–108; Alaska Rules of Evidence 803(18); Arizona Rules of Evidence 803(18); Arkansas Uniform Rules of Evidence 803(18); Cal.Evid.Code § 1341; Colorado Rules of Evidence 803(18); Delaware Uniform Rules of Evidence 803(18); Hawaii Rules of Evidence 803(b)(18); Idaho Rules of Evidence 803(18); Kan.Stat.Ann. § 60–460(cc) (1986); Minnesota Rules of Evidence 803(18); Montana Rules of Evidence 803(18); Nev.Rev.Stat.Ann. § 51.255 (1986); New Hampshire Rules of Evidence 803(18); New Mexico Rules of Evidence 11–803(R); N.C.Gen.Stat. § 8–40.1; North Carolina Rules of Evidence 803(18); North Dakota Rules of Evidence 803(18); Oklahoma Evidence Code 12 O.S.1981, § 2803(18); South Dakota Rules of Evidence SDCL 19–16–22; Texas Rules of Evidence 803(18); Utah Rules of Evidence 803(18); Washington Rules of Evidence 803(a)(18); West Virginia Rules of Evidence 803(18); Wis.Stat.Ann. § 908.03(18); Wyoming Rules of Evidence 803(18). Several other jurisdictions have embraced the federal view by way of judicial decision. See: *Cross v. Huttenlocher*, 185 Conn. 390, 440 A.2d 952 (1981); *Heilman v. Snyder*, 520 S.W.2d 321 (Ky.1975). Those states recognizing a learned treatise exception now constitute a majority.

Whether Pennsylvania should join the growing number of jurisdictions which permit excerpts of treatises and other publications to be read to the jury is not for this Court to decide. That decision is better left to the legislature.

> [M]uch of the testimony of experts testifying in person consists of information they have obtained from such sources. Permitting the sources to be proved directly would not be as great a change as might at first be supposed and would greatly improve the quality of information presented to trial courts in litigated cases. Moreover, ... there are sufficient assurances of trustworthiness to justify equating a learned treatise with a personally-testifying expert. Not only does the author of the treatise have no bias in any particular case, but it is also likely that he was motivated in writing the treatise by a strong desire to state accurately the full truth. The authors are also aware that their material will be read and evaluated by others in their field, and there is therefore additional strong pressure to be accurate.
>
> *McCormick on Evidence* § 321, at 899 (3d ed. 1984), paraphrasing 6 Wigmore, *Evidence* §§ 690–92 (Chadbourn Rev.1976) (footnote omitted).

Moreover, even if we were able and inclined to change the rule in Pennsylvania, Majdic would not be entitled to a new trial. The portions of the treatises and patents which Majdic wanted to read to the jury were offered solely to demonstrate the availability in 1949 of safety guards which could have been incorporated into the press brake sold by Cincinnati Machine. The record is clear, however, that Cincinnati Machine conceded such availability; it defended on other grounds. Therefore, the failure of the jury to have the verbatim texts of these treatises was harmless.

## IV. *Prior Accidents*

During trial, Majdic sought to introduce admissions made by Cincinnati Machine in discovery proceedings that there had been prior instances of injuries sustained by operators of press brakes. The evidence was offered to show that Cincinnati Machine had become aware following sale of the machine that it possessed a propensity for causing harm. The trial court disallowed the evidence because it would have created collateral issues and because plaintiff-appellant was not prepared to show that the prior accidents had occurred under circumstances which were the same or similar to those of the accident which were presented to the jury in the action being tried. Majdic contends that this was error.

There is, as Majdic suggests, a rapidly developing body of opinion which favors the imposition upon manufacturers of a post-sale duty to warn. See: Allee, *Post–Sale Obligations of Product Manufacturers*, 12 Fordham Urb.L.J. 625 (1984); Royal, *Post–Sale Warnings: A Review and Analysis Seeking Fair Compensation Under Uniform Law*, 33 Drake L.Rev. 817 (1983); Schwartz, *Post–Sale Duty To Warn: Two Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U.L.Rev. 892 (1983); Comment, *Products Liability: Post–Sale Warnings*, 1978 Ariz.St.L.J. 49; Note, *Post–Sale Warnings: Products That Go "Bump" in the Night*, 1984 Ariz.St.L.J. 719; Note, *The Manufacturer's Duty to Notify of Subsequent Safety Improvements*, 33 Stan.L.Rev. 1087 (1981). Most jurisdictions which have

considered the issue have recognized such a duty. See generally: Allee, *supra* (collecting cases); Royal, *supra* (collecting cases). Other states have enacted statutory provisions which codify the duty of product manufacturers to issue post-sale warnings. See: Ala.Code § 6–5–502 (Supp.1983); Idaho Code § [6–1406], 6–1306 (1980); N.D. Cent.Code § 28:01.1–02 (Supp.1983); Wash.Rev.Code § 7.72.010 (Supp.1983); N.H.Rev.Stat.Ann. § 507–D:2 (1983). This trend has been evident on the federal level as well. A post-sale duty to warn is recommended in the Model Uniform Product Liability Act § 104(c)(6), 44 Fed. Reg. 62,714, 62,721 (1979). Various legislative bills which have been submitted to Congress have also proposed the adoption of such a duty. See: S. 2631, 97th Cong.2d Sess. (1982); H.R. 5214, 97th Cong. 1st Sess. (1981). There is no reason to believe that the Pennsylvania courts would not also recognize a continuing duty to warn of dangers discovered for the first time after a product has been placed into the stream of commerce.

To prove constructive notice of a dangerous or defective condition, a trial court may under certain circumstances receive evidence of prior accidents occurring under the same or similar circumstances. Before such evidence may be received, however, the proponent must show that the prior accident was sufficiently similar to constitute constructive notice of a defective condition. "This limited exception, permitting the introduction of evidence of similar accidents, is tempered by judicial concern that the evidence may raise collateral issues, confusing both the real issue and the jury." *Whitman v. Riddell,* 324 Pa.Super. 177, 181, 471 A.2d 521, 523 (1984). It follows that much must be left to the discretion of the trial judge. *Stormer v. Alberts Construction Co.,* 401 Pa. 461, 466, 165 A.2d 87, 89 (1960); *Whitman v. Riddell, supra,* 324 Pa.Super. at 180–181, 471 A.2d at 523. See also: *Craven v. Niagara Machine & Tool Works Co., Inc.,* 417 N.E.2d 1165 (Ind.App.1981). "To constitute reversible error, a ruling on evidence ... must be shown not only to have been erroneous, but harmful to the party complaining." *Whitman v. Riddell, supra,* 324 Pa.

Super. at 180, 471 A.2d at 522, quoting *Anderson v. Hughes*, 417 Pa. 87, 92, 208 A.2d 789, 791 (1965). See: *Bessemer Stores, Inc. v. Reed Shaw Stenhouse, Inc.*, 344 Pa.Super. 218, 224, 496 A.2d 762, 765 (1985).

In the instant case, the evidentiary ruling of the trial court was not erroneous. Although appellant offered an admission by Cincinnati Machine of sixty-four accidents preceding his injury, there was no evidence to show the precise circumstances under which any of them had occurred. Therefore, the burden of showing the relevancy of the admissions of prior accidents was not met; and the trial court properly excluded the evidence thereof.

## V. *The Cross-examination of Richard Griesheimer*

During the cross-examination of Richard Griesheimer, the former manager of engineering and the present staff engineer for Cincinnati Machine, Majdic attempted to question Griesheimer regarding answers to interrogatories which had been prepared by other agents of Cincinnati Machine and which had been submitted by the manufacturer prior to trial. In these answers to interrogatories, it had been indicated that Cincinnati Machine had no knowledge of injuries, other than Majdic's, resulting from use of its press brakes. These answers, however, were inconsistent with answers to similar interrogatories which Cincinnati Machine had filed in another case in another jurisdiction. In the other action Cincinnati Machine had listed additional accidents involving Cincinnati press brakes. Majdic sought to cross-examine Griesheimer about this inconsistency in order to impeach his credibility. Majdic argues on appeal that he is entitled to a new trial because the court prohibited this cross-examination, and the majority agrees. I do not. In my judgment, the ruling was a proper exercise of discretion by the trial court.

The scope and limits of cross-examination are within the sound discretion of the trial court and a ruling thereon will not be reversed in the absence of a clear abuse of that discretion. *Townsend Will*, 430 Pa. 318, 323, 241 A.2d 534, 537, *cert. denied, Cochran v. Morris*, 393 U.S. 934, 89 S.Ct.

293, 21 L.Ed.2d 270 (1968); *Kemp v. Qualls*, 326 Pa.Super. 319, 324, 473 A.2d 1369, 1371 (1984). Here, the trial court refused to permit the cross-examination requested by Majdic because it viewed it as an attempt to circumvent its ruling disallowing evidence of prior accidents. As such, the cross-examination was viewed as being unduly prejudicial. This prejudice, the court concluded, would outweigh any materiality or relevance the evidence would have on the issue of credibility. I am able to find no abuse of discretion in this ruling. In the first place, the answers to interrogatories in another action in another jurisdiction were irrelevant to attack the witness' credibility unless he had prepared the answers in the other action. Moreover, the answers given in another proceeding in another jurisdiction did not contradict the testimony of the witness from the witness stand in the instant case. Finally, the cross-examination with respect to answers to interrogatories filed in another action was collateral to the issue being litigated and more than likely to confuse that issue and mislead the jury. See: *Stormer v. Alberts Construction Co., supra; Whitman v. Riddell, supra.* See also: *Prashker v. Beech Aircraft Corp.,* 258 F.2d 602 (3d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958); *Craven v. Niagara Machine & Tool Works, Inc., supra.* For these reasons alone, the trial court could properly exclude the cross-examinations.

This action, as is true of most design defect cases, involved complex issues and was difficult to try. My review of the record suggests that despite the inherent difficulty, the case was well tried by both court and counsel.

I would affirm the judgment.

OLSZEWSKI, Judge, concurring and dissenting statement:

I join in Parts II and IV of the majority opinion and in the disposition of the case.

I join with Judge Wieand in Parts I, II, and IV of his Dissenting Opinion.